676 A.2d 127

BARBARA ANDERSON, PLAINTIFF–APPELLANT, v. DR. JOSEPH PICCIOTTI, DEFENDANT–RESPONDENT, AND ASSOCIATED PODIATRISTS, J/S/A, DEFENDANT.

Argued January 17, 1996—Decided May 23, 1996.

198

*Alan M. Lands* argued the cause for appellant.

*Robert E. Paarz* argued the cause for respondent (*Paarz, Master & Koernig* attorneys; *Mary Ann C. O'Brien*, on the brief).

The opinion of the court was delivered by

COLEMAN, J.

The critical issue raised in this medical malpractice case involving the amputation of a toe is whether the jury should have been instructed in accordance with the enhanced risk standard of causation explicated in *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.*2d 398 (1990). After the trial court denied defendant's request for an enhanced risk instruction, the jury found that defendant committed malpractice that proximately caused plaintiff to sustain $70,000 in damages. The Appellate Division reversed, finding, among other reasons, that an enhanced risk instruction should have been given.

We granted certification, 142 *N.J.* 455, 663 *A.*2d 1361 (1995), and reverse. We hold: (1) this is not a *Scafidi*-type case; and (2) when a defendant requests a *Scafidi*-type causation instruction in a case in which an alleged preexistent condition and the effect of the defendant's tortious conduct both harm the plaintiff within a relatively short time, the defendant has the burden of proving the

extent to which the preexisting condition reduced the value of the plaintiff's resultant harm.

*I*

Plaintiff, Barbara Anderson, has been an insulin-dependent diabetic since 1981 and suffers from heart problems, rheumatoid arthritis, which is in remission, and osteoarthritis, which causes pain in her back, neck, knees, feet, and hands. On September 10, 1987, plaintiff consulted with Dr. Marcelli, an orthopedist, for foot pain. During the examination the doctor observed that plaintiff's toenails were curved inward. He referred her to Dr. Urbas, a podiatrist, for nail care. While clipping her toenails, Dr. Urbas cut plaintiff's big toe, causing some bleeding. Over the following week, the toe remained red and swollen, and plaintiff, unable to obtain another appointment with Dr. Urbas, visited Dr. Lurakis, an internist who had cared for her since early 1986. Dr. Lurakis diagnosed cellulitis of the toe and prescribed an oral antibiotic and warm soaks for the toe.

On September 22, 1987, plaintiff visited Dr. Lurakis again, complaining of chest pains related to her heart condition. Because the chest pains persisted, Dr. Lurakis admitted plaintiff to the Kessler Memorial Hospital on October 7, 1987.

While plaintiff was in the hospital, Dr. Lurakis again examined her toe, which continued to be red and swollen. He requested defendant, Dr. Picciotti, a podiatrist, to look at the toe. On October 8, Dr. Picciotti examined plaintiff and noted an infected callus and an abscess with pustular drainage. He removed the nail, and took a culture of the drainage. That culture revealed the presence of staphylococcusaureus, which is a bacteria commonly found in infections of the foot and a common cause of osteomyelitis.

Concerned that plaintiff may have had osteomyelitis, Dr. Picciotti, on October 8, ordered a radiologic bone scan, often used in detecting infections in the bone. The radiologist reported that the bone scan indicated inflammation consistent with osteomyelitis.

On October 14, Dr. Picciotti advised plaintiff that his diagnosis was osteomyelitis, and discussed treatment alternatives and her prognosis. By then, plaintiff had been taking oral antibiotics prescribed by Dr. Lurakis for four weeks.

Plaintiff was discharged from the hospital on October 14 with instructions to report to Dr. Picciotti's office the next day. She did so, and Dr. Picciotti observed that the toe was red and swollen, and continued to believe that the proper diagnosis was osteomyelitis. Dr. Picciotti ordered a second bone scan. A report, dated October 20, interpreted that scan as showing a slightly less certain, but nonetheless likely, indication of bone infection.

Plaintiff was readmitted to Kessler Memorial Hospital on October 22 by defendant. Dr. Lurakis made a notation in the hospital records that the first "bone scan showed that she had a chronic, smoldering osteomyelitis of the distal aspect of the great toe," and the second bone scan "revealed continuing osteomyelitis." That same day, plaintiff discussed her treatment plan with Dr. Picciotti and an intern. Plaintiff's right great toe was amputated on October 23 by Dr. Picciotti without obtaining a bone biopsy.

The trial was in large part a battle of the experts with respect to whether Dr. Picciotti deviated from the accepted standard in amputating plaintiff's toe. Plaintiff's expert, Dr. Joseph, a podiatrist, testified:

> [F]rom what I saw in the record: the improving toe, no deep tracks, no x-ray changes after six weeks of there being soft tissue infection ... [there] was no clinical finding consistent with osteomyelitis. So that it appears that the ... second positive bone scan was an osteo[myelitis] or not. And if that's the case, I feel that's the deviation of standard of care just using a bone scan in the absence of other impressive clinical signs and symptoms.

On cross-examination, Dr. Joseph asserted that the mere fact that plaintiff was diabetic, and thus predisposed to suffer from osteomyelitis, should not have affected Dr. Picciotti's decision to amputate. According to Dr. Joseph, gangrene or other evidence of vascular insufficiency myelitis, conditions associated with diabetes that may require amputation, had not been noted in plaintiff's medical records.

Dr. Joseph further testified on cross-examination that, although he did not believe that plaintiff suffered from osteomyelitis at the time of the amputation, he could not conclusively state, based on his examination of the medical records, that plaintiff either had or did not have osteomyelitis. Furthermore, Dr. Joseph admitted that the radiologist's conclusion that the bone scan indicates "an inflammatory process which most likely may represent an osteomyelitis" would be taken into account by a podiatrist in deciding whether to amputate.

On redirect, however, Dr. Joseph stated that he "was not sold" that plaintiff had osteomyelitis and that amputation is "a terminal option ... a last option." Dr. Joseph also stated that plaintiff's condition had been improving while she was on oral antibiotics. Dr. Joseph did not testify that intravenous antibiotic (IV) treatment is a probable cure.

Defendant's expert, Dr. Mandracchia, a podiatrist, testified that Dr. Picciotti had an adequate basis for diagnosing plaintiff's condition as osteomyelitis. He also testified that curing osteomyelitis with IV treatment was possible, but generally improbable. Dr. Mandracchia was unable to determine whether Dr. Picciotti's diagnosis that plaintiff suffered from osteomyelitis was correct. Thus neither plaintiff's nor defendant's expert could state conclusively whether plaintiff had osteomyelitis.

## II

The case was tried on three theories of liability. First, plaintiff alleged that Dr. Picciotti deviated from the accepted standard of care when he amputated her great toe without first obtaining a bone biopsy to make a definitive diagnosis of osteomyelitis. Thus, plaintiff contended that although she had an inflammatory process in her great toe, a bone biopsy would have prevented defendant from misdiagnosing the condition as osteomyelitis. Second, plaintiff alleged that defendant deviated from the proper standard of care because he failed to administer IV treatment for a non-osteomyelitic inflammatory process before amputating the toe.

Third, plaintiff alleged that defendant performed the amputation without obtaining plaintiff's informed consent. The defense to all three theories was that plaintiff had osteomyelitis and defendant did not deviate from the proper standard of care.

During a jury charge conference, defense counsel requested a *Scafidi* charge. Defendant argued that he had not deviated from the standard of care because osteomyelitis was properly diagnosed pre- and post-operatively and amputation was a proper treatment option for osteomyelitis. He asserted that because plaintiff had osteomyelitis, IV treatment would not have guaranteed a cure; therefore, there was a risk that the toe would have been amputated "in any event." In denying the request for a *Scafidi* charge, the trial court reasoned:

I kept getting a feeling I was trying to force a square peg into a round hole by trying to make this case fit into that increased risk, loss of chance line of cases. I don't think that this is the type of case that the courts were looking at when they rendered their decisions in these cases. This isn't really a lost chance case, the testimony and the allegations by the plaintiff really don't go to any allegations of increased risk based on what the defendant did or did not do, there is really no testimony of record from which a jury could allocate any risk, could they have found risk, it's just not there. I don't think that there is an argument that the defendant's negligence combined with the pre-existing condition to cause the injury, I think as [defense counsel] said himself this morning what we are talking about here is the decision to amputate.

Accordingly, the jury was given the standard "but for" proximate cause instruction. *Polyard v. Terry*, 160 *N.J.Super.* 497, 511, 390 *A.*2d 653 (App.Div.1978), *aff'd,* 79 *N.J.* 547, 401 *A.*2d 532 (1979). A special verdict sheet was submitted to the jury that combined the first two theories of liability in which the jury was asked whether "Dr. Joseph Picciotti [deviated] from accepted standards of medical practice by performing an amputation on plaintiff's great right toe?" The jury answered, "yes." The jury also found that the deviation proximately caused plaintiff's injury, presumably, amputation of the toe. The jury found, however, that the amputation was performed with plaintiff's informed consent. Defendant appealed.

In his brief filed with the Appellate Division, defendant stated that "[p]laintiff's theory at trial was that if Dr. Picciotti suspected

osteomyelitis, he was required by the standard of care to obtain a bone biopsy to conclusively diagnose its existence before he amputated the toe." Defendant then argued that a *Scafidi* charge should have been given to the jury because

> there was a certain risk that the patient would have had an amputation of the toe (or the entire foot) in any event. The risk which the patient had when she entered Kessler Memorial Hospital on October 7, 1986, was that she would have had an amputated limb.... Since it is possible that this patient would have had an amputation anyway, it was improper to fail to charge the jury on increased risk or last chance of recovery pursuant to the *Scafidi* standard.

In her brief filed with the Appellate Division, plaintiff argued that apart from her lack of informed consent theory of liability, defendant misdiagnosed an inflammatory process in her great toe as osteomyelitis by neglecting to obtain a bone biopsy before amputating the toe. Plaintiff conceded that if osteomyelitis was the proper diagnosis, she could not prevail under either of the first two theories advanced at trial because both plaintiff's and defendant's experts agreed that amputation was a proper treatment option for osteomyelitis.

Plaintiff further asserted that during the trial she did not advocate "that the failure to give intravenous antibiotics or the delay in diagnosing osteomyelitis [with a bone biopsy] and treating same caused the infection to spread" or otherwise worsen. Consequently, plaintiff argued, a *Scafidi* charge was unwarranted because there was neither an allegation nor evidence that defendant's alleged deviations combined with the alleged osteomyelitis to cause a worsening of plaintiff's condition.

In an unpublished opinion, the Appellate Division reversed, finding that the evidence was insufficient to support the verdict in terms of causation. Justifying the Appellate Division's conclusion was the underlying rationale that if plaintiff had osteomyelitis, irrespective of whether a confirmatory bone biopsy was performed, amputation was conceded by all experts to be an accepted treatment option. The court found that the "[a]mputation would have been unnecessary only if [plaintiff did not have osteomyelitis] of the big toe of her right foot."

Although the court reversed the judgment for plaintiff, it did not dismiss plaintiff's complaint. The court based its decision not to dismiss the complaint on its finding that the evidence was sufficient for the jury to have concluded that plaintiff did not have osteomyelitis and, therefore, IV treatment "would probably have ... cured" the inflammatory process in her toe. The court also found that even if there was osteomyelitis that could not have been *cured* with the IV treatment, that treatment "would have offered a significant chance of cure." Viewed in that context, the court concluded that the case is controlled by *Scafidi.*

The court summarized its reasons for applying *Scafidi* by stating:

> ... the evidence was sufficient to permit the jury to find that Dr. Picciotti's failure to administer intravenous antibiotics was actionable malpractice, whether or not Ms. Anderson had osteomyelitis. If she did not have osteomyelitis, the omission was malpractice by the conventional definition of proximate cause because, on that premise, antibiotics would probably have cured the infection and have saved her toe. If she did have osteomyelitis, then evidence that Dr. Picciotti's failure to administer intravenous antibiotic therapy caused her to lose a significant chance of achieving a cure without amputation.... *Lanzet v. Greenberg,* 126 *N.J.* 168, 188, 594 *A.*2d 1309 (1991); *Scafidi, supra,* 119 *N.J.* at 101, 574 *A.*2d 398; *Evers v. Dollinger,* 95 *N.J.* 399, 417, 471 *A.*2d 405 (1984); *Roses v. Feldman,* 257 *N.J.Super.* 214, 218, 608 *A.*2d 383 (App.Div.1992); *Battenfeld v. Gregory,* 247 *N.J.Super.* 538, 546, 589 *A.*2d 1059 (App.Div.1991).

### III

#### -A-

Plaintiff contends that this case does not warrant a *Scafidi* charge because defendant's negligence did not combine with a preexisting condition to create the ultimate harm. Rather, defendant's negligence was the sole cause of the ultimate harm. Plaintiff characterizes the ultimate harm as the amputation itself. Plaintiff points out that the trial focused on the misdiagnosis of osteomyelitis; no evidence admitted showed that defendant's negligence combined with skin or bone infection to cause the condition to worsen.

■ Plaintiff argues that a *Scafidi* charge is appropriate only when treatment or a lack of it increases the risk of harm. Accordingly, the harm must flow from a combination of the preexisting condition and the defendant's negligence, not solely from a defendant's negligence. Here, plaintiff asserts that the amputation was caused solely by defendant's misdiagnosis of osteomyelitis and not from a combination of a preexisting condition and defendant's negligence.

-B-

Determining whether a *Scafidi*-type charge is required focuses on the appropriateness of the standard "but for" proximate cause jury instruction. In *Evers v. Dollinger*, 95 *N.J.* 399, 471 *A.*2d 405 (1984), this Court addressed the issue of proximate causation in the context of harm resulting from both a plaintiff's preexistent condition and a defendant's negligent discharge of a duty related to that preexisting condition. *Id.* at 412–17, 471 *A.*2d 405. In that case, the defendant failed to properly diagnose a lump in the plaintiff's right breast. *Id.* at 402–03, 471 *A.*2d 405. Seven months later a second physician determined the lump to be cancerous, requiring a radical mastectomy. *Id.* at 403, 471 *A.*2d 405. The plaintiff's expert testified that the lump increased in size during that seven-month period. *Id.* at 404–05, 471 *A.*2d 405. The expert also stated that plaintiff's type of cancer had a 25% chance of recurrence after surgery and that the seven-month delay increased that risk. *Ibid.* The cancer metastasized to the lungs before the appeal was concluded. *Id.* at 403–04, 471 *A.*2d 405.

The Court in *Evers* adopted Pennsylvania's modified standard of proximate causation in medical malpractice cases, holding:

[P]laintiff should be permitted to demonstrate, within a reasonable degree of medical probability, that the seven months delay resulting from defendant's failure to have made an accurate diagnosis and to have rendered proper treatment increased the risk of recurrence or of distant spread of plaintiff's cancer, and that such increased risk was a substantial factor in producing the condition from which plaintiff currently suffers.

[*Id.* at 417, 471 *A.*2d 405.]

In *Scafidi, supra,* 119 *N.J.* at 108, 574 *A.2d* 398, the Court adhered to the holding in *Evers* and clarified its meaning. The rule of law was summarized in the following manner:

Evidence demonstrating with a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition raises a jury question whether the increased risk was a substantial factor in producing the ultimate result. *Evers, supra,* 95 *N.J.* at 417, 471 *A.2d* 405. The rationale underlying the use of a two-pronged jury instruction bears elaboration. Because this modified standard of proximate causation is limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm—as distinguished from cases in which the deviation alone is the cause of harm—the jury is first asked to verify, as a matter of reasonable medical probability, that the deviation is within the class, *i.e.,* that it increased the risk of harm from the preexistent condition. *Accord Hamil v. Bashline,* 481 *Pa.* 256, 392 *A.2d* 1280, 1286–88 (1978); *Daniels v. Hadley Mem. Hosp.,* 566 *F.2d* 749, 757–58 (D.C.Cir.1977); *Roberson v. Counselman,* 235 *Kan.* 1006, 686 *P.2d* 149, 159 (1984); *Restatement (Second) of Torts* § 323(a). Assuming that the jury determines that the deviation increased the risk of harm from the preexistent condition, we use the "substantial factor" test of causation because of the inapplicability of "but for" causation to cases where the harm is produced by concurrent causes. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 41, at 266–68 (5th ed. 1984); Wex S. Malone, *Ruminations on Cause–In–Fact,* 9 *Stan. L.Rev.* 60, 88–90 (1956). The "substantial factor" standard requires the jury to determine whether the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause. *Accord Brown v. United States Stove Co.,* 98 *N.J.* 155, 172, 484 *A.2d* 1234 (1984); *Hamil, supra,* 392 *A.2d* at 1288–89.

[*Id.* at 108–09, 574 *A.2d* 398.]

Thus, under *Scafidi,* a careful analysis of the evidence is required to determine whether the evidence is sufficient to permit a jury to decide, as a matter of reasonable medical probability, that both prongs of a two-part test are satisfied. First, the evidence must permit a jury to find that defendant was negligent and that defendant's negligence increased plaintiff's risk of harm from an established preexistent condition. If that prong is satisfied, then there are concurrent causes of the harm to the plaintiff. When concurrent causes produce the harm, the "but for causation" standard may not be charged to a jury. *Id.* at 109, 574 *A.2d* 398. Therefore the second prong of the test requires a jury to apply the

"substantial factor" standard of causation. *Ibid.* The "substantial factor" standard directs a jury to determine whether the deviation in the context of the preexistent condition "was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Ibid.*

The evidence and legal principles that drive the determination of causation with respect to damages in *Scafidi*-type cases, are quite similar to those involved in our comparative negligence law, *N.J.S.A.* 2A:15–5.1. *Scafidi, supra,* 119 *N.J.* at 113, 574 *A.*2d 398. In a *Scafidi*-type case, as with comparative negligence, " 'a tortfeasor should be charged only with the value of the interest he [or she] destroyed.' " *Scafidi, supra,* 119 *N.J.* at 112, 574 *A.*2d 398 (quoting Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 *Yale L.J.* 1353, 1356 (1981)).

Unlike the complicated claims in *Evers,* in which the defendant's failure to diagnose cancer permitted the cancer to spread and enhanced the chances of post-operative recurrence, and *Scafidi,* in which the mother of a premature child claimed that the defendant's failure to diagnose and treat the mother's early labor caused the premature birth and death of her infant, plaintiff's allegations in the present case are not complex. There is no question here whether the amputation itself was performed in a technically proficient manner. Rather, this case comes down to the simple question of whether defendant misdiagnosed the inflammatory process in plaintiff's right great toe as osteomyelitis. If there was no osteomyelitis, plaintiff contends that amputation was an inappropriate treatment option. If the diagnosis was accurate, plaintiff agrees with defendant that the amputation was proper. The case became complicated only when defendant, as the trial court observed, tried "to force a square peg into a round hole by trying to make this case fit into the increased risk ... line of cases."

There was neither an allegation nor any evidence that defendant's alleged negligence combined with a preexistent condition to

cause plaintiff harm. Throughout the trial, plaintiff's counsel adhered to the thesis espoused in his opening statement that "this case is about a doctor amputating a part of someone's body for no sound medical reason.... There's no gangrene. There's no skin infection. There's no bone infection." In other words, plaintiff alleges that defendant misdiagnosed osteomyelitis and but for that misdiagnosis, the toe would not have been amputated. She alleges that it was defendant's misdiagnosis alone during the fourteen days between October 8 and 23, 1987, that caused the amputation. Plaintiff contends that notwithstanding that misdiagnosis, her condition continued to improve up until the time of the surgery instead of worsening as a result of the misdiagnosis or otherwise. Defendant, on the other hand, has consistently maintained that the pre- and post-operative diagnoses of osteomyelitis were accurate.

Furthermore, plaintiff had nothing to gain by resisting a *Scafidi* charge. First, the standard "but for all-or-nothing" causation charge that was given is more stringent than the *Scafidi* "substantial factor" charge. *Olah v. Slobodian,* 119 *N.J.* 119, 129, 574 *A.*2d 411 (1990). Second, plaintiff did not and, indeed, could not prevent defendant from establishing that plaintiff's damages were induced by concurrent causes, one of which was a preexistent condition unrelated to defendant's negligence. *Restatement (Second) of Torts* § 433A(1). If concurrent causes could be established, defendant would have been entitled to the benefit of *Scafidi,* provided that he could also "demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are." *Fosgate v. Corona,* 66 *N.J.* 268, 273, 330 *A.*2d 355 (1974); *Scafidi, supra,* 119 *N.J.* at 112–13, 574 *A.*2d 398.

The Appellate Division properly determined that the evidence in the present case was insufficient to require a *Scafidi* charge or to permit apportionment under *Fosgate.* The court stated, "the record is devoid of the evidence which would have been necessary in order to enable the jury to apportion damages between Ms. Anderson's preexisting condition and defendant's negligence and

to determine the percentage value of that lost chance." The same evidence is used in a *Scafidi*-type case to determine a tortfeasor's fault and the apportionment of damages. Because the evidence was insufficient to require a *Scafidi* charge, the defendant should not be given "yet another bite of this thoroughly-chewed apple." *Whitfield v. Blackwood,* 101 *N.J.* 500, 500, 502 *A.2d* 1132 (1986) (Clifford, J., concurring); *accord Lanzet, supra,* 126 *N.J.* at 193, 594 *A.2d* 1309 (Pollock, J., dissenting).

## IV

Next we must decide who has the burden of proof when a *Scafidi* causation charge is requested. In the *Scafidi*-type case, "the question is whether [a] plaintiff's damage claim should be limited to the value of the lost chance for recovery." *Scafidi, supra,* 119 *N.J.* at 111, 574 *A.2d* 398. Such damages can be characterized as increased risk or reduced chance damages. *Id.* at 116–17, 574 *A.2d* 398 (Handler, J., concurring). Because the intent of a *Scafidi*-type charge is to "more precisely confine[ ] physicians' liability for negligence to the value of the interest damaged," either plaintiff or defendant under varying circumstances may request such a charge. *Id.* at 113, 574 *A.2d* 398.

Burden of proof is identical to burden of persuasion which is defined as

the obligation of a party to meet the requirements of a rule of law that the fact be proved either by a preponderance of the evidence or by clear and convincing evidence or beyond a reasonable doubt, as the case may be.

[*N.J.R.E.* 101(b)(1).]

Conceptually, this means the party requesting the *Scafidi* charge has the burden of persuading the trial court and the jury based on the proofs presented that the evidence is sufficient to sustain such a charge.

Ordinarily, plaintiffs in medical malpractice cases have the burden of proving negligence and proximate cause with respect to both negligence and damages. *Caldwell v. Haynes,* 136 *N.J.* 422, 436, 643 *A.2d* 564 (1994); *Buckelew v. Grossbard,* 87 *N.J.* 512, 525,

435 A.2d 1150 (1981); *Germann v. Matriss*, 55 N.J. 193, 208, 260 A.2d 825 (1970). In a few exceptional cases, however, the burden of proof on some issues may shift to the defendant. *Anderson v. Somberg*, 67 N.J. 291, 300–302, 338 A.2d 1, *cert. denied*, 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975). In some other cases, the traditional "but for" proximate cause standard is replaced with the more flexible "increased risk substantial factor" charge articulated first in *Evers, supra*, 95 N.J. at 417, 471 A.2d 405, and later in *Scafidi, supra*, 119 N.J. at 108, 574 A.2d 398.

The more flexible standard of causation in some medical malpractice cases was deemed essential due to the difficulties and unfairness of identifying, defining, and proving injury with a standard "but for" proximate cause charge. *Evers, supra*, 95 N.J. at 413, 471 A.2d 405. The typical *Evers–Scafidi* case is one in which a patient is on a downward course and defendant negligently fails to alter that course by delaying proper treatment.

█ Typically, in an *Evers–Scafidi* type of case, it is the plaintiff who will rely on the modified causation standard to diminish the chances of a no cause under the "but for" test of causation. The "increased risk substantial factor" standard provides a less onerous burden for establishing causation. *Olah, supra*, 119 N.J. at 129, 574 A.2d 411; *Hake v. Manchester Township.*, 98 N.J. 302, 310, 486 A.2d 836 (1985). In *Scafidi*, it was the plaintiff who sought a "substantial factor" charge. *Scafidi v. Seiler*, 225 N.J.Super. 576, 582, 543 A.2d 95 (App.Div.1988), *aff'd*, 119 N.J. 93, 574 A.2d 398 (1990). Consequently, a plaintiff relying on the *Scafidi* causation standard generally has the burden of proving that defendant's negligence caused an increased risk of harm to plaintiff and that the increased risk was a substantial factor in causing the ultimate harm. Notwithstanding the fact that the *Scafidi* standard is less stringent than the "all or nothing but for" standard, it does not alter a plaintiff's burden of proving the case by a fair preponderance of the evidence. *Battenfeld, supra*, 247 N.J.Super. at 548, 589 A.2d 1059.

Although the *Scafidi* substantial factor causation standard was devised for the benefit of plaintiffs because it was the defendant who effectively deprived the plaintiff of a greater chance to survive or avoid deterioration, *Evers, supra,* 95 *N.J.* at 417, 471 *A.2d* 405, there are cases, such as the present, in which the defendant, not the plaintiff, seeks a *Scafidi* charge. If a case clearly falls within the *Evers–Scafidi* parameters, then a plaintiff cannot avoid apportionment of damages under *Scafidi* because a plaintiff's recovery is "limited to the value of the lost chance of avoiding harm." *Scafidi, supra,* 119 *N.J.* at 111, 574 *A.2d* 398; *Evers, supra,* 95 *N.J.* at 412 n. 7, 471 *A.2d* 405. But when it does not clearly appear that a *Scafidi* charge is required and a plaintiff resists such a charge, then a defendant has the burden of persuading the trial court that a *Scafidi* charge is appropriate.

It is significant that only sixteen days passed between plaintiff's initial examination by defendant and the amputation. In a case such as this one, in which

the preexisting condition and the effect of the defendant's tortious conduct attach nearly simultaneously or within a relatively short time, the burden of proving the extent to which the preexisting condition reduced the value of the interest in question should be shifted to the defendant. If a defendant seeks to reduce his liability by asserting that part of the harm is not attributable to his tortious conduct, the burden of proving both that the plaintiff's injury is capable of apportionment and what the apportionment should be should rest on the defendant. Under the suggested approach to chance, this requirement would include determining the extent to which the preexisting condition reduced the value of the chance-interest adversely affected by the defendant's tortious conduct.

[*King, supra,* at 1393.]

Generally, no dispute exists with regard to the existence and identity of a preexistent disease or condition in a *Scafidi*-type case. Should a dispute arise, as here, regarding those issues, the defendant must bear the burden of establishing the existence and identity of such a condition or disease. A preexistent condition or disease is one that has become sufficiently associated with a plaintiff prior to the defendant's negligent conduct so that it becomes a factor that affects the value of the plaintiff's interest destroyed by the defendant. *Id.* at 1357.

The burden of proof required to satisfy a *Scafidi* causation charge requires evidence that, within a reasonable degree of medical probability, demonstrates that the defendant's delay in making a proper diagnosis and rendering proper treatment increased the risk of worsening the condition or disease, and that the delay was a substantial factor in producing the plaintiff's current condition. That burden must be sustained by a fair preponderance of the evidence. Although the Court has regarded the increase in risk resulting from the negligent act to be "unquantifiable," *Evers, supra,* 95 *N.J.* at 406, 471 *A.*2d 405; *see Battenfeld, supra,* 247 *N.J.Super.* at 546, 548, 589 *A.*2d 1059, a defendant nonetheless has the "burden of segregating recoverable damages from those solely incident to the preexisting disease." *Fosgate, supra,* 66 *N.J.* at 273, 330 *A.*2d 355.

In this case, however, defendant simply did not demonstrate that he was entitled to either a *Scafidi* or *Fosgate* charge. In a *Scafidi*-type case, the reasonable medical probability standard for present purposes is sufficient to assist a jury on the issue of causation. *Evers, supra,* 95 *N.J.* at 417, 471 *A.*2d 405; *Coll v. Sherry,* 29 *N.J.* 166, 175, 148 *A.*2d 481 (1959).

### V

Plaintiff further contends that the Appellate Division should not have reversed the jury's verdict after it found that plaintiff's expert provided an ample basis for the jury to find a deviation from the accepted standard of podiatric practice, and after it concluded that defendant failed to sustain the burden of proving that he was entitled to a *Scafidi* charge.

In overturning the jury verdict, the Appellate Division read too narrowly plaintiff's contention that defendant should have ordered a bone biopsy. It interpreted the failure to obtain a pre-operative biopsy as negligence based on an act of omission without regard to how the biopsy would impact the determination of whether osteomyelitis existed. Plaintiff's theory was that defendant failed to utilize the most accurate diagnostic aid—a bone biopsy—to deter-

mine whether there was osteomyelitis. It was the absence of the biopsy in conjunction with other evidence that plaintiff relied on to support her claim that she did not have osteomyelitis. Plaintiff never contended that the failure to obtain a biopsy was a proximate cause of the amputation. Rather, she has consistently maintained that it was the absence of osteomyelitis that made the amputation unnecessary, not simply the failure to obtain a bone biopsy.

Viewed in that context, plaintiff identified a substantial body of evidence from which the jury could have concluded that osteomyelitis did not exist notwithstanding the substantial evidence to the contrary, including Dr. Joseph's refusal to testify that plaintiff was probably not suffering from osteomyelitis.

In addition to the evidence previously identified, one day prior to the amputation the toe exuded no pus and was only slightly red. Defendant testified that although he has performed more than one hundred toe amputations that did not involve gangrene, this was the first amputation he performed without first obtaining a bone biopsy. The pathologist's post-operative examination revealed "chronic inflammation" that was not specified as osteomyelitis. Indeed, plaintiff's expert testified that "chronic inflammation" was consistent with plaintiff's arthritis rather than osteomyelitis.

Finally, our careful study of the record fails to disclose sufficient evidence to support the Appellate Division's conclusion that failure to administer IV therapy constituted negligence. Defendant as well as the experts who testified on behalf of plaintiff and defendant stated that IV therapy would have made no difference in this case.

The judgment of the Appellate Division is reversed and the jury verdict reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.