**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2154-23

KAYRONNA C. BENJAMIN-
CARTER, as Ad Pros Administrator
of the Estate of S.E.C.,
KAYRONNA C. BENJAMIN-
CARTER, individually,
and GREGORY L. CARTER,

     Plaintiffs-Appellants,

v.

JOHN FONTANETTA, M.D.,
QIN WANG, M.D., NEAL
MAGEEAN, PA-C, CLARA
MAASS MEDICAL CENTER,
VICTOR MAROUN, M.D.,
BARRY BENZING, PA-C,
and HACKENSACK UMC
MOUNTAINSIDE MEDICAL
CENTER,

     Defendants-Respondents.

_____

Argued February 4, 2025 – Decided August 7, 2025

Before Judges Gooden Brown and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-0101-19.

E. Drew Britcher argued the cause for appellants (Britcher, Leone & Sergio, LLC, attorneys; E. Drew Britcher, of counsel; Jessica E. Choper, on the briefs).

Jennifer Suh argued the cause for respondent John Fontanetta, M.D., and Neal Mageean, PA-C (Weber Gallagher Simpson Stapleton Fires & Newby, attorneys; Kenneth M. Brown, of counsel and on the brief; Kathleen T. Dilts, on the brief).

Lauren M. Strollo and Douglas M. Singleterry argued the cause for respondents Clara Maass Medical Center and Qin Wang, M.D. (Vasios, Strollo & Duran, PA, attorneys; Lauren M. Strollo, of counsel; Douglas M. Singleterry, on the brief).

Sharon K. Galpern argued the cause for respondent Victor Maroun (Stahl & DeLaurentis, PC, attorneys; Sharon K. Galpern, on the brief).

Evan B. Magnone argued the cause for respondent Hackensack UMC Mountainside Medical Center (Schenck, Price, Smith & King, LLP, attorneys; William Buckley, of counsel and on the brief; Evan B. Magnone, on the brief).

Adonaid C. Medina and Gary W. Patterson, Jr., argued the cause for Barry Benzing, PA-C (Barker Patterson Nichols, LLP, attorneys; Adonaid C. Medina, on the brief).

PER CURIAM

A-2154-23

Plaintiffs, Kayronna C. Benjamin-Carter and Gregory L. Carter, parents of S.E.C.,[1] and Kayronna C. Benjamin-Carter in her capacity as the representative of S.E.C.'s estate, appeal the trial court's order granting summary judgment to all defendants. Plaintiffs sued two hospitals, several doctors, and other medical personnel after the death of their three-week old son, alleging that defendants failed to properly evaluate, test, and treat their infant son during two emergency department visits, resulting in his death from dehydration and an undiagnosed infection. On appeal, plaintiffs contend the trial court committed error by: finding plaintiff's expert not qualified to testify; barring plaintiff's expert testimony as a net opinion; and concluding that the modified causation analysis established by the Supreme Court in Gardner v. Pawliw, 150 N.J. 359 (1997) did not apply.

We reverse and remand for proceedings consistent with this opinion.

I.

We gather the facts from the summary judgment record, viewing them in the light most favorable to plaintiff as the non-moving party. See Richter v. Oakland Bd. of Educ., 246 N.J. 507, 515 (2021). The tragic circumstances

---

[1] Due to the confidential medical information in the record, we use initials for S.E.C. to protect his privacy. R. 1:38-3(a)(2).

which provide the backdrop for this appeal commenced with the birth of infant S.E.C. on August 30, 2017, to plaintiffs Kayronna Benjamin-Carter and Gregory Carter. Three weeks later, on September 19, 2017, the infant's mother was reassured during a routine checkup that her child was progressing well. On the morning of September 22, 2017, Kayronna observed her child vomiting and in distress. Concerned, she took him to the emergency department at Clara Maass Medical Center ("Clara Maass"), reporting to staff that S.E.C. showed symptoms of fever, vomiting, crankiness, excessive crying, and unusual fussiness.

At Clara Maass, defendant Neal Mageean, a physician assistant, examined S.E.C., and reported a rectal temperature of 98.6 degrees and an elevated heart rate of 189 beats per minute. The record shows that under Clara Maass' established "History of Present Illness and Review of Symptoms" protocol, S.E.C. tested negative for diarrhea, fever, shortness of breath, decreased urine output, and diminished activity or alertness. Recognizing the need for specialized consultation, Mageean alerted defendant Dr. Qin Wang, a pediatrician, who recommended an abdominal ultrasound to rule out pyloric stenosis. When the ultrasound returned negative results, no additional diagnostic testing was pursued at Clara Maass. Mageean then discharged S.E.C. after receiving approval from Dr. Wang, at 5:57 p.m. with instructions directing

A-2154-23

the Carters to seek immediate medical attention should vomiting persist beyond twenty-four hours or if S.E.C.'s condition deteriorated. These instructions were included in a discharge letter signed by defendant Dr. John Fontanetta, who signed the letter, but did not see S.E.C. Following discharge, no Clara Maas medical personnel were involved in S.E.C.'s ongoing care.

Two days later, on September 24, 2017, the parents' escalating concerns prompted them to seek emergency care at Hackensack UMC Mountainside Medical Center ("Mountainside"). Kayronna's reported observations of S.E.C. at that time included decreased appetite, persistent vomiting, orange discharge in the diaper, labored breathing, and inconsolable crying. She also reported that she had observed her baby's eyes rolling back into his head. The attending medical team, comprised of Physician Assistant Barry Benzig and Dr. Victor Maroun, documented a temperature of 99.4 degrees, while characterizing S.E.C. as alert, adequately hydrated, and free from respiratory distress. They diagnosed S.E.C. with diarrhea and discharged him with instructions for his parents to arrange follow-up care with his primary physician the following morning.

In the early morning hours of September 25, 2017, at approximately 4:00 a.m., the Carters found S.E.C. unresponsive in his crib. They called 911 and emergency personnel responded to their home. The first responders detected no

5

pulse and transported S.E.C. to Clara Maass. S.E.C. was pronounced dead at 5:29 a.m.

On September 26, 2017, Dr. Frederik DiCarlo, a New Jersey State Assistant Medical Examiner, performed an autopsy on S.E.C. His post-mortem examination included physical inspection of external anatomy and internal organs, microscopic analyses, complete body radiographic imaging, toxicological and histological studies, comprehensive bacterial and viral cultures, and metabolic testing protocols. Dr. DiCarlo also obtained a neuropathological examination of S.E.C.'s brain and central nervous system.

Dr. DiCarlo opined in his report that S.E.C.'s death resulted from Sudden Unexplained Infant Death (SUID). He excluded potential causative factors, including sepsis, viral or bacterial infections. Dr. DiCarlo's found "no evidence of a life-threatening congenital malformation, infectious disease, or other natural disease to explain the infant's death." He also rejected dehydration as a contributing factor, basing this conclusion upon his physical examination, clinical observations, and the results of post-mortem laboratory analyses.

Plaintiffs' expert was Dr. Michael G. Tunik, a specialist in emergency pediatric medicine. Dr. Tunik reviewed the record, including, but not limited to: medical records from Clara Maass and Mountainside regarding S.E.C.'s care,

A-2154-23

management and treatment; deposition transcripts of the parties and witnesses; autopsy reports and related test results; first responder reports; and photos and a video of S.E.C. taken by his parents. Dr. Tunik opined that defendants' failure to perform diagnostic testing on S.E.C. violated the standards of emergency room pediatric care, given the symptoms he presented to both Clara Maass' and Mountainside's emergency rooms staff. His report stated:

> Based upon the records and/or the facts of this matter which I have reviewed . . . I find that the care, treatment, skill, and/or knowledge exercised or exhibited in the care and treatment of [S.E.C.] by defendants [Fontanetta, Wang, Clara Maass, Maroun, Benzing, and Mountainside] fell outside professional standards of Emergency Department care for [S.E.C.] regarding possible sepsis, possible intestinal obstruction, possible seizures, and possible dehydration through blood, urine, and CSF testing, hospital admission, antibiotic therapy, testing for intestinal obstruction, and testing for other causes of vomiting, irritability and poor feeding, testing for blood salt abnormalities, possible acid base abnormalities, [and] possible seizures are related to [S.E.C.]'s deterioration and death. Had [S.E.C.] been tested, hospitalized, and treated for sepsis, intestinal obstruction, dehydration, seizures and liver and pancreas damage . . . more likely than not he would have survived and not died on September 25, 2017.

In his report, Dr. Tunik identified S.E.C.'s symptoms as reported by his parents, as well as the symptoms observed and recorded by defendants on each of the two emergency room visits. He identified the relevant standard of care

7

which related to each reported or observed symptom, and then specified the type of diagnostic test that defendants should have given, based on the observed or reported symptom. For example, page three, paragraph three of his report stated:

> No actions were taken based on elevated heart rates of 189 and 176.
>
> . . . .
>
> Testing for causes of an elevated heart rate including blood tests for infection (CBC, blood culture, urine culture), blood tests for anemia, blood test for acid base imbalance, blood tests for dehydration, and heart tests (EKG, troponin, ultrasound) would have been required under Emergency Department standards of care. These tests would, more likely than not, have identified evidence of infection in the blood (sepsis), and led to appropriate treatment, and hospital admission.

Dr. Tunik was deposed on October 13, 2022. Dr. Tunik testified to his academic credentials and professional experience, which included scholarly research on emergency pediatric medicine related to SUID and service as an associate professor in both Emergency Medicine and Pediatrics at the NYU Grossman School of Medicine. Dr. Tunik also testified that he is board certified in general pediatrics, emergency medicine, and pediatric emergency medicine. He has worked as a pediatric emergency physician at Bellevue NYU Medical Center, where he was actively involved in clinical care and teaching.

8

Additionally, he has taught residents, medical students, pediatric emergency fellows, and attending physicians in the pediatric emergency department. Dr. Tunik has extensive clinical experience, having served as a pediatric emergency attending physician for more than thirty years.

On cross-examination, Dr. Tunik acknowledged never having performed an autopsy, lacking professional credentials or board certification in forensic pathology, and having last observed an autopsy during his medical school training. Nevertheless, Dr. Tunik opined to a reasonable degree of medical certainty that the infant's cause of death was dehydration with an undiagnosed infection and stated "had those tests been done and had [the infant] been admitted, he would not have been at home getting more ill."

Following the completion of discovery, all defendants moved for summary judgment, asserting plaintiffs' failure to establish proximate cause. After argument, the trial court granted defendants' motions and dismissed plaintiffs' claims with prejudice, supporting the order with an oral statement of reasons. In its statement of reasons, the trial court made four critical path findings: first, that Dr. Tunik lacked the requisite qualifications under N.J.R.E. 702 to offer opinions challenging the medical examiner's autopsy conclusions; second, that the doctor's testimony constituted an impermissible net opinion

A-2154-23

under N.J.R.E. 703, being speculative and unsupported by record evidence; third, Dr. Tunik's report was directly contradicted by the medical examiner's findings; and finally, that the modified causation analysis set forth by the Supreme Court in Gardner was inapplicable because S.E.C. had not established a preexisting medical condition at the time of his emergency evaluations or as revealed by autopsy.

On appeal, plaintiffs argue that the trial court committed error by finding that: Dr. Tunik was unqualified to testify; his opinion was a net opinion; and that plaintiffs failed to establish proximate cause pursuant to Gardner.

II.

We consider the relevant standards of review, as well as the sequence in which we apply them to the record before us.

When "a trial court is 'confronted with an evidence determination precedent to ruling on a summary judgment motion,' it 'squarely must address the evidence decision first.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 384-85 (2010)). "Appellate review . . . proceeds in the same sequence, with the evidentiary issue resolved first, followed by the summary judgment determination of the trial court." Ibid. (quoting Est. of Hanges, 202 N.J. at 385).

10

In reviewing a trial court's decision on admission of expert testimony in a civil action, we apply an abuse of discretion standard. In re Accutane Litig., 234 N.J. 340, 392 (2018). The trial court's ruling should be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

Our review of a trial court's summary judgment decision is de novo. DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 180 (2024); see also R. 4:46-2(c). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Ibid. (alteration in original) (quoting Friedman v. Martinez, 242 N.J. 449, 472 (2020)); see also R. 4:46-1 to - 6. To rule on summary judgment, courts must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Vizzoni v. B.M.D., 459 N.J. Super. 554, 567 (App. Div. 2019) (quoting Liberty

Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007)). "Summary judgment should be granted 'if the discovery and any affidavits show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" DeSimone, 256 N.J. at 180-81 (quoting Perez v. Professionally Green, LLC, 215 N.J. 388, 405 (2013)) (internal quotation marks omitted).

III.

A.

Plaintiffs argue that the trial court erred in finding Dr. Tunik unqualified as an expert. Specifically, they contend that Dr. Tunik's training, education, and experience qualify him to offer an opinion on the cause of death, that his opinion would assist the trier of fact, and that his opinion was based on facts in the record. We consider the relevant law.

N.J.R.E. 702 states, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." The rule has three requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2)

A-2154-23

the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.

[Townsend, 221 N.J. at 53 (quoting Creanga v. Jardal, 185 N.J. 345, 355 (2005)) (citation omitted).]

Regarding the "sufficient expertise" element, "court[]s take a liberal approach when assessing a person's qualifications to testify as an expert." Jenewicz, 193 N.J. at 454. N.J.R.E. 702 permits an expert to be qualified by education or by occupational experience. Rosenberg v. Tavorath, 352 N.J. Super. 385, 400 (App. Div. 2002). Stated differently, an expert can be qualified to give an opinion by "study without practice or practice without study." State v. Smith, 21 N.J. 326, 334 (1956). To the extent that an expert's qualifications reveal weaknesses, such vulnerabilities can be explored on cross-examination to impact the weight that a jury will assign to the expert's opinions. State v. Jenewicz, 193 N.J. 440, 455 (2008).

The record shows Dr. Tunik served as an Associate Professor in Emergency Medicine & Pediatrics at NYU Grossman School of Medicine and as the Director of Research for the Division of Pediatric Emergency Medicine. The record further shows he was board certified in general pediatrics, emergency medicine, and pediatric emergency medicine. Additionally, Dr. Tunik has

13

taught residents, students, pediatric emergency fellows, and pediatric emergency attending physicians, and has performed extensive clinical work as an attending physician in emergency departments over the last thirty years. He practiced as an attending physician in emergency departments for over thirty years and conducted significant research, including on SUID. Dr. Tunik's substantial academic credentials, professional certifications, teaching roles, and decades of clinical and research experience in pediatric emergency medicine establish a sufficient foundation for his expert testimony regarding medical causation on this record.

Defendants are entitled to argue what they will surely describe as deficits in Dr. Tunik's qualifications regarding the field of pathology. However, such vulnerability may be properly explored on cross-examination, and it goes to the weight rather than the admissibility of his opinions. Jenewicz, 193 N.J. at 455. While Dr. Tunik may not be specialized in pathology or autopsy procedures, he does not have to be. His extensive qualifications demonstrate that he does specialize in what to do when an infant child, less than one-month old, presents in an emergency room with potentially life-threatening symptoms. We take a liberal approach when assessing a person's qualification to testify as an expert, id. at 454, and we note that plaintiffs do not offer Dr. Tunik to opine on a

14

standard of care for pathologists, but on the diagnostic failures of emergency room medical personnel, and the consequences which flowed from them.

Based on Dr. Tunik's extensive education and experience, we depart from the trial court's analysis and conclude Dr. Tunik is qualified to offer an opinion to a degree of reasonable medical probability regarding the proximate cause of S.E.C.'s death.

B.

Plaintiffs next argue the trial court erred by finding that Dr. Tunik's opinions were not based upon the evidence in the record and abused its discretion by concluding that Dr. Tunik rendered a net opinion. Again, we consider the applicable law.

Under N.J.R.E. 703, an expert's opinion must be "grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert, which is not necessarily admissible in evidence, but which is the type of data normally relied upon by experts.'" Townsend, 221 N.J. at 53 (quoting Polzo v. Cnty of Essex, 196 N.J. 569, 583 (2008)).

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by

A-2154-23

factual evidence or other data.'" Id. at 53-54 (quoting Polzo, 196 N.J. at 583). The rule "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

"An expert's conclusion is excluded if it is based merely on unfounded speculation and unquantified possibilities." Ibid. (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)) (internal quotation marks omitted). Medical-opinion testimony concerning the cause of an injury "'must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible.'" State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988) (quoting Johnesee v. Stop & Shop Cos., Inc., 174 N.J. Super. 426, 431 (App. Div. 1980)). "[A]n expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions but testifies only to a view about a standard that is personal.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011)) (internal quotation marks omitted). Expert opinion must be excluded if it is based merely on unfounded speculation and unquantified possibilities. Grzanka, 301 N.J. at 580. An expert's opinion that fails to address

16

facts in the record that directly contradict the expert's conclusions should be barred as a net opinion.  Smith v. Est. of Kelly, 343 N.J. Super 480, 497 (App. Div. 2001).

Dr. Tunik's opinion does not constitute a net opinion and satisfies the N.J.R.E. 703 requirements.  Dr. Tunik's conclusions are grounded in the record, which included his review of all medical records, the autopsy report, witness testimony, and a video presented by plaintiffs.  Dr. Tunik identified detailed factual support for his opinions, including:  S.E.C.'s presenting symptoms of vomiting, fever, and distress; the documented clinical findings; and his analysis of what additional diagnostic testing may have revealed had it been performed. Dr. Tunik's opinion addresses the central issue of causation by explaining how defendants' failure to perform additional diagnostic testing and provide appropriate treatment more likely than not resulted in the infant's death.

Dr. Tunik opined that, "had someone . . . either [at] the first or second [emergency room] visit . . . worked [S.E.C.] for possible sepsis, possible dehydration, possible seizure, the workup with intravenous therapy and admission would have prevented him from dying.  He would be alive today much more likely than not."  This statement, along with other statements in Dr. Tunik's testimony and his written report, satisfies the requisite reasonable degree of

17

medical probability. Dr. Tunik's supporting analysis included reliance upon his extensive experience in pediatric emergency medicine, his SUID research, and his analysis of the clinical presentation and progression of the infant's condition. Dr. Tunik's opinion reflects sound medical reasoning centered on his well-documented experience and his fact-based methodology, rather than impermissible speculation. The trial court's decision to exclude Dr. Tunik's testimony as a net opinion was a mistaken exercise of discretion.

We express no opinion as to what weight a jury may assign Dr. Tunik's opinion on causation. We simply conclude that his opinion is sufficiently grounded in facts and clearly articulated methodology. It does not constitute an inadmissible net opinion under N.J.R.E. 703.

C.

We turn to plaintiffs' contention that the trial court erroneously concluded that the modified causation standard established in Gardner does not apply because S.E.C. did not have a preexisting condition.

To establish a claim of medical malpractice, "a plaintiff must present expert testimony establishing, (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (quoting Gardner, 150

18

N.J. at 375.)  The burden of proof on all elements of an ordinary or medical negligence claim—which includes that the defendant's conduct proximately caused the plaintiff's injury—is normally on the plaintiff.  See Komlodi v. Picciano, 217 N.J. 387, 409 (2014).

In a medical malpractice action, generally "the causation element . . . is the most complex."  Verdicchio v. Ricca, 179 N.J. 1, 23 (2004).  However, "[w]hen a patient is treated for a preexisting condition and a physician's negligence worsens that condition, it may be difficult to identify and prove the precise injury caused by the physician."  Komlodi, 217 N.J. at 414 (citing Evers v. Dollinger, 95 N.J. 399, 413 (1983)).  Our Supreme Court has created a two-pronged test to address such a scenario: "a jury must decide whether any 'negligent treatment increased the risk of harm posed by a preexistent condition' and, if so, 'whether the increased risk was a substantial factor in producing the ultimate result.'"  Ibid. (quoting Scafidi v. Seiler, 119 N.J. 93, 108 (1990)).  "In the typical Scafidi case, the plaintiff seeks treatment for a preexisting condition, and the physician, through negligence, either fails to diagnose or improperly treats the condition, causing it to worsen and sometimes causing the plaintiff to lose the opportunity to make a recovery."  Id. at 393.

In Gardner, the Court applied the Scafidi test where a plaintiff alleged that there was a failure to perform diagnostic tests:

> When the prevailing standard of care indicates that a diagnostic test should be performed and that it is a deviation not to perform it, but it is unknown whether performing the test would have helped to diagnose or treat a preexistent condition, the first prong of Scafidi does not require that the plaintiff demonstrate a reasonable medical probability that the test would have resulted in avoiding the harm. Rather, the plaintiff must demonstrate to a reasonable degree of medical probability that the failure to give the test increased the risk of harm from the preexistent condition.
>
> [Gardner, 150 N.J. at 387.]

The Court articulated a strong rationale for this approach, stating, "[w]e reach that conclusion to avoid the unacceptable result that would accrue if trial courts in such circumstances invariably denied plaintiffs the right to reach the jury, thereby permitting defendants to benefit from the negligent failure to test and the evidentiary uncertainties that the failure to test created." Ibid.

In charging a jury under these circumstances, trial courts are guided by Model Jury Charge (Civil), 5.50E, "Pre-Existing Condition—Increased Risk/Loss of Chance—Proximate Cause" (rev. Mar. 2021). Komlodi, 217 N.J. at 413-14 (describing the charge as a "Scafidi charge"). A necessary prerequisite for a trial court to issue a Scafidi charge is a finding that plaintiff suffered from

20

a preexisting condition. If a dispute over the existence and identity of a preexistent condition arises in a <u>Scafidi</u>-type case, the party seeking the <u>Scafidi</u> charge "bear[s] the burden of establishing the existence and identity of such a condition . . . ." <u>See</u> <u>Anderson v. Picciotti</u>, 144 N.J. 195, 211 (1996). "In instructing the jury, the trial court is expected to review facts relevant to the charge and to identify the preexisting disease or condition." <u>Komlodi</u>, 217 N.J. at 417.

We turn to the relevant section of the model charge:

> In this case, the Plaintiff had a pre-existing condition which, by itself, had a risk of causing the plaintiff the harm the plaintiff ultimately experienced in this case. However, the plaintiff contends that the plaintiff lost the chance of a better outcome because of the Defendant's deviation from accepted standards of medical practice. [Insert here a detailed factual description of the case, such as, (1) the plaintiff contends that she told the defendant that she felt a lump in her breast in January of 2000, that the defendant was negligent in not ordering a mammogram or other test for cancer until January 2001, and that as a result of the delay the cancer spread to her lungs, liver and brain, and is now likely to cause her death; or (2) the plaintiff contends that her husband went to the defendant hospital emergency room after suffering a heart attack. The plaintiff further asserts that the defendant negligently misdiagnosed her husband's heart attack, and sent her husband home, where he died.]
>
> [Model Jury Charge (Civil), 5.50E, at 2.]

Here, the trial court found that it could not identify a preexisting condition from the existing record. However, we view the preexisting condition question presented by this record differently, and conclude that it is a question for the jury to resolve, not the court.

Our jurisprudence defines a preexisting condition as, "'one that has become sufficiently associated with a plaintiff prior to the defendant's negligent conduct so that it becomes a factor that affects the value of the plaintiff's interest destroyed by the defendant.'" Holdsworth v. Galler, 345 N.J. Super. 294, 299 (App. Div. 2001) (quoting Anderson, 144 N.J. at 211) (citing Joseph H. King, Jr., Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353, 1357 (1981)). "In other words, it is where 'the patient [seeks] treatment from a physician with the express purpose to obtain treatment which would alter or delay the outcome attributable to the condition.'" Id. at 299-300 (quoting Golinski v. Hackensack Med. Ctr., 298 N.J. Super. 650, 655 (App. Div. 1997)). We also consider the clear and more expansive preexisting condition standard set forth by the Gardner Court, which calls for application of its holding "when the prevailing standard of care indicates that a diagnostic test should be performed and that it is a deviation not to perform it, but it is unknown whether

performing the test would have helped to <u>diagnose or treat</u> a preexistent condition . . . . " <u>Gardner</u>, 150 N.J. at 387 (emphasis added).

With all inferences given to the non-moving party at summary judgment, we conclude that there is a genuine issue of material fact concerning whether S.E.C. had a preexisting condition at the time he presented to each emergency room, Clara Maass and Mountainside. Dr. Tunik identified multiple abnormal medical symptoms which three-week old S.E.C. presented to defendants, including: progressive vomiting, decreased oral milk intake, behavioral changes, an elevated heart rate, unusually colored diaper discharge, and likely seizures. After reviewing the record, Dr. Tunik's opinion was that S.E.C. suffered from undiagnosed dehydration and an undiagnosed infection. He further opined that, had proper diagnostic testing been performed, those or other conditions may have been identified earlier and appropriate measures taken to avoid worsening of S.E.C.'s condition. Defendants' expert, Dr. DiCarlo, opines that neither dehydration nor infection was the cause of death, but rather SUID. At this stage of the proceeding, we leave the question of what weight to assign to the competing experts' opinions, and which expert to believe, to the jury.

If the jury finds that S.E.C. had a preexisting condition, then the jury should proceed to undertake the <u>Gardner</u>/<u>Scafidi</u> modified proximate cause

analysis, consistent with Model Civil Charge 5.50E, to determine whether defendants' alleged negligence increased the risk of harm or loss of chance to survive, and whether that increased risk or loss of chance was a substantial factor in S.E.C.'s death. If the jury finds that S.E.C. had no preexisting condition, then their inquiry ends, and the trial judge would enter judgment for defendants. Subject to the sound discretion of the trial judge, we envision that the jury's role as factfinder is best aided by the use of a modified jury interrogatory, appropriately tailored to the record developed at trial, to supplement the sample jury verdict interrogatories provided in Model Civil Charge 5.50E.

We conclude: plaintiff's expert was qualified to testify under N.J.R.E. 702; plaintiff's expert did not issue a net opinion; and that, subject to a jury finding that S.E.C. had a preexisting condition, the modified causation standard under Gardner/Scafidi applies.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2154-23