**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1917-23

ROBERT F. BURCKHARDT, JR.
and SHERRY BURCKHARDT-
DEMARCO, Administrators of the
Estate of ROBERT F.
BURCKHARDT, SR.,

      Plaintiffs-Appellants,

v.

ADVANCED SUBACUTE
REHABILITATION CENTER AT
SEWELL, LLC and ADVANCED
SUBACUTE REHABILITATION
CTR AT SEWELL, LLC,

      Defendants-Respondents.

_____

Argued November 18, 2025 – Decided February 24, 2026

Before Judges Rose, DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. L-0381-20.

Richard J. Talbot argued the cause for appellants (Law Office of Andrew A. Ballerini, attorneys; Richard J. Talbot, of counsel and on the briefs).

Walter F. Kawalec, III, argued the cause for respondents (Marshall Dennehey, PC, attorneys; Lynne N. Nahmani and Walter F. Kawalec, III, on the brief).

PER CURIAM

Plaintiffs Robert F. Burckhardt, Jr. and Sherry Burckhardt-Demarco, administrators of the estate of their deceased father, Robert F. Burckhardt Sr.,[1] appeal from a series of Law Division orders, including the October 11, 2023 order granting a directed verdict in favor of defendant Advanced Subacute Rehabilitation Center at Sewell, LLC, (the facility) and dismissal of plaintiffs' complaint for negligence, violations of the New Jersey Nursing Home Responsibilities and Rights of Residents Act (NHA), N.J.S.A. 30:13-1 to -19, and punitive damages, and the February 21, 2024 order denying reconsideration.[2]  Plaintiffs' suit arose from their father's death two days after choking and suffering cardiac arrest while a resident at the facility.

---

[1]  Because plaintiffs and decedent share the same surname, we use first names referring to decedent's son as Robert Jr. and decedent as Robert Sr. to avoid confusion.  No disrespect is intended.

[2]  We address only plaintiffs' claims against the facility—the singular named party to this appeal.

We have reviewed the record in light of applicable law and conclude the court properly dismissed plaintiffs' claims against the facility for lack of sufficient proof of proximate causation—an essential element of all plaintiffs' substantive claims, including those alleging NHA violations.[3] We affirm.

I.

The following summary is derived from the record, including the testimony and evidence admitted over five days of trial before a jury in October 2022.

A. Overview, Plaintiffs' Claims, and Pretrial Motions

Certain facts are undisputed. Decedent, a seventy-two-year-old

---

[3] Plaintiffs also appeal from a September 26, 2023 pre-trial order granting the facility's motion to bar one of plaintiffs' experts from offering an opinion regarding decedent's pain and suffering. Because plaintiffs' merits brief does not address or make any arguments concerning the barred pain-and-suffering expert testimony, and advanced none at oral argument, we have no basis upon which to assess the court's order or plaintiffs' challenge, and deem this issue waived. See Midland Funding, LLC v. Thiel, 446 N.J. Super. 537, 542 n.1 (App. Div. 2016) (when appellant's notice of appeal lists issues later "not briefed on appeal," the Appellate Division "consider[s] [the] appeal from those [issues] abandoned" and "waived").

Moreover, because we affirm on causation grounds, we need not reach plaintiffs' remaining challenges to the court's evidentiary rulings which are unrelated to our independently dispositive causation determination.

A-1917-23

lymphedema and dysphagia[4] patient, was readmitted to the facility on January 25, 2019, after an eleven-day hospitalization due to concerns with his low oxygen level and infected wounds. The following morning, decedent's breakfast was served shortly before 8:00 a.m., and his son, Robert Jr., arrived at 8:05 a.m. to find decedent in his room, unattended, and choking. Despite immediate intervention by facility staff and emergency responders, decedent suffered cardiac arrest, was transported to a nearby hospital, and died two days later.

At the time, the facility's care plan called for "monitoring" decedent while eating to minimize the risk of choking. Specifically, the facility first developed a December 28, 2018 "Resident Interdisciplinary Care Plan" for "dysphagia/swallowing impairments," listing "decreased mastication" and "recent [history] of aspiration" under "problem[s]." The plan implemented "interventions" to rectify those issues, including: "skilled dysphagia therapy [three to five times per week] for forty-two days for dysphagia management"; "encourag[ing] ninety degrees positioning during meal and maintain[ing] for

---

[4] As defined by plaintiffs' nursing expert, "dysphagia is a condition in which the . . . muscles used for swallowing have become impaired, [or] . . . weakened, and" impacted individuals "aren't able to protect their airway." Plaintiffs' forensic pathology expert defined "lymphedema" as "swelling of [the] legs" due to excess fluid.

thirty min[utes] after each meal"; "implement[ing] dysphagia/aspiration precautions"; and "therapeutic feeding."

The facility also developed for the decedent an "Interdisciplinary Plan of Care" related to "Nutrition/Weight Loss" with two dates listed—December 24, 2018 and January 25, 2019—indicating "dysphagia" as a "problem/need." It identified the following protocol: "provide diet as ordered"; "monitor tolerance to prescribed diet"; "provide food based on patient's preferences"; "provide unhurried meal times"; "encourage 100% consumption of all meals/fluids provided"; "provide assistance with eating PRN"; "refer to dietician for nutritional evaluation"; "speech [t]herapist evaluation/screen as deemed necessary"; "encourage resident to take small sips/bites"; "encourage resident to alternate liquids and solids"; "monitor for signs and symptoms of aspiration"; and "if coughing occurs, hold food/liquid until coughing resolves."

On March 17, 2020, plaintiffs filed their complaint against the facility, alleging "claims of nursing home negligence in general, violations of nursing home residents' rights under N.J.S.A. 30:13-5, as a separate cause of action recognized . . . under N.J.S.A. 30:13-8(a), and various claims of general negligence, including . . . nursing negligence, all as direct and vicarious liability

5                                                    A-1917-23

claims."[5]  (Emphasis omitted).

Specifically, count one alleged decedent's death "[wa]s a direct and proximate result" of the facility's negligence and gross negligence.  Plaintiffs claimed the facility "held [itself] out as [a] specialist[] in the field of adult nursing care and rehabilitation with the expertise necessary to maintain the health and safety of persons unable to care adequately for themselves," and "had significant control over the day[-]to[-]day operations of the . . . nursing home," but "due to the negligence of . . . [the facility] and violations of residents' rights . . . by inappropriate monitoring and failure(s) to provide appropriate care," decedent suffered serious injury and death.  Count one alleged various acts of negligence including, "failure to properly train employees to deal with geriatric/disabled residents who are incapacitated and likely to be subject to choking when unattended"; "failure to prevent choking and asphyxiation"; "failure to properly monitor and assess, in general and, specifically, for choking and asphyxiation"; "failure to adequately train staff to monitor for, as well as address, choking and asphyxiation emergencies"; "failure to provide adequate

_____

[5]  Additional claims were separately pled against the "Medical Director" (count seven); "Administrator" (count eight); "Director of Nursing" (count nine); "Nurses" (count ten); "Certified Nurses' Aide(s)" (count eleven); and "Fictitiously Named Defendants" (count twelve).  However, no specific individuals were named and none are parties to this appeal.

equipment for choking, dysphagia, suctioning and other equipment"; "failure to adequately train staff how to utilize choking, dysphagia, suctioning and other equipment"; and "failure to take proper actions to cease choking and asphyxiation." (Emphasis omitted).

Count two alleged negligence and gross negligence under the NHA, asserting the facility violated various federal regulations. Count three alleged "negligence and gross negligence—supervision and monitoring," claiming the facility "knew or should have known that [its] residents were elderly and/or disabled and in need of particular care and supervision," and "failed to exercise adequate care in the supervision and monitoring of [its] elderly and/or disabled residents, such as . . . [decedent], to whom [it] owed such a duty." Count four alleged "negligence and gross negligence—negligent hiring of staff and negligent monitoring/management/supervision by supervisors."

Plaintiffs sought punitive damages, alleging in count five the facility's "outrageous, willful and wanton" conduct "shocked the conscience of the community" and that it acted or failed to act with "complete disregard to [decedent]'s rights, and in reckless indifference to [his] rights." Finally, count six alleged a violation of the rights of skilled nursing home residents, under "N.J.S.A. 30:13-5 . . . and N.J.S.A. 30:13-8(a), which recognizes a private cause

of action for violations of nursing home residents' rights."[6]

Plaintiffs provided an affidavit of merit from Bonnie Tadrick, RN-BCN, incorporating her opinion "that there exists a reasonable probability that the care, skill, or knowledge exercised or exhibited in the treatment, practice, or work performed by [the facility] . . . in [its] care and treatment of [decedent] fell outside acceptable standards of practice."  They also secured an expert forensic pathologist, Ian Hood, M.B., who opined the cause of death was "choking on eggs."

After discovery closed, the court denied motions for summary judgment, but ordered a bifurcated trial of the punitive damages claim.  The trial court also entered a pretrial order barring plaintiffs' introduction at trial of the video deposition of former nurse and the facility's organizational designee, Lynn Homicillada, despite her availability to testify.  The court found live testimony "more favored," and reasoned, although Rule 4:16-1(b) permits an adverse party to use the deposition against the deponent, plaintiffs sought to use the video against the facility as independent substantive testimony.

B.  The Trial Testimony

---

[6]  N.J.S.A. 30:13-5 is sometimes referred to as "The Resident's Rights Act," as it identifies a nursing home resident's rights.

A-1917-23

Robert Jr. testified at trial and described his father's failing health leading to his death. He explained finding his father unable to move in November 2018 due to his swollen legs from lymphedema, necessitating admission to the hospital. Decedent suffered from wounds on his lower body and later developed pneumonia. Robert Jr. explained his father was first admitted to the facility when released from the hospital in December 2018, and shared a room with his wife, admitted for care due to her own illness.

Robert Jr. recounted his father was again hospitalized in January 2019, because of his low oxygen level and infected wounds, but upon discharge returned to the facility on January 25. Robert Jr. did not recall any discussion with anyone from the facility that day regarding a monitoring protocol for his father before he left the facility that night. Decedent's daughter Sherry testified and confirmed decedent was "working on his lymphedema" and "walking with a walker" around November of 2018, before developing an infection and winding up in the hospital where wounds on his lower body were discovered. She indicated her father was improving when he entered the facility and joined her mother. Sherry also testified she "never had any conversations at all about . . . supervising" decedent while he ate, and "usually if the meal was there, there was an aide feeding [her] mother and [decedent] had his meal [and] he

could eat on his own."

Robert Jr. described returning to the facility at 8:05 a.m. the morning after decedent's readmission to the facility to bring his father coffee and found him alone with the door "open about four to six inches." Once in the room, he saw his father partially "hanging off the bed." He recalled decedent's voice was "real raspy," as he told his son he was choking. Robert Jr. asked his father if he was "okay," and his father answered, "yes." Robert Jr. noticed a tray of scrambled eggs in the room. After "smacking" his father on the back, Robert Jr. left the room to retrieve decedent's nurse for help, who returned with suctioning equipment. He testified his father was eventually taken to the hospital and "had gotten a pulse," but the hospital "turned off his life support" two days later.

The responding nurse, Kelly Cinalli, LPN, testified and explained Robert Jr. alerted her of decedent's choking the morning it occurred. She recalled she saw decedent around "ten to fifteen minutes" earlier, getting ready to eat breakfast and confirmed he "was by himself in the room to eat breakfast." She explained another nurse set up decedent and placed the eggs in front of him just before she "c[a]me in [to] see" him around 7:45 a.m.

When summoned by Robert Jr., Nurse Cinalli testified she returned to find decedent "laying on his left side, leaning," "his coloring was off," and "he didn't

look like he was breathing." Her notes from the incident were introduced into the record, indicating decedent was "unconscious" when she entered the room with "no pulse noted," 9-1-1 was called, decedent was intubated, and the hospital "was able to remove eggs."

Nurse Cinalli indicated decedent "was capable of self-feeding," and placing decedent's eggs in front of him "was part of [decedent's] mechanical soft diet." She added she "would not have left [decedent's] room if he made a complaint to [her] about the breakfast," if she saw him choking, coughing, looking gray, if "his vital signs weren't good," or if he sought supervision from the nursing staff or otherwise indicated discomfort. The nurse recalled administering CPR to decedent, noting "emesis," which meant decedent regurgitated partially, and staying with him until basic and advanced life support ambulances arrived.

Testimony from first responders confirmed life support services arrived "at the patient at 8:25 [a.m.]" who was "unconscious, . . . unresponsive, [and] non-breathing" while facility staff had begun CPR and their attempt to clear decedent's airway. One first responder testified, reading from her report, "during [the] resuscitation he got pulses back" after which she performed a "video laryngoscopy intubation," to view decedent's larynx which revealed

11

"scrambled egg and fixed secretion noted at the level of the vocal cords." Her report further noted patient's response as "improved" and she "arrived at the hospital" with decedent at 8:58 a.m.

Portions of the deposition testimony of the facility's director of nursing at the time of decedent's death, were entered into evidence. The nursing director noted the facility was subject to federal regulations as "part of the standard of care for the nursing home to follow," as well as state regulations and the NHA. She explained decedent was rated a "one for supervision," meaning "set-up help only" was provided. She identified a note from decedent's speech therapist indicating "decreased mastication" and "a recent history of . . . aspiration." The director further acknowledged the plan indicated "skilled dysphagia therapy, three to five times a week for forty-two days for dysphagia management," and explained decedent's dysphagia and "mechanical soft diet," were identified on the care plan at the time of the January 26 choking incident. She explained, as in decedent's case upon his readmission on January 25, 2019, the facility typically has fourteen days to develop a care plan upon a resident's arrival, even if the resident previously resided at the home and had a prior plan.

Homicillada testified as "the [facility's] organization designee with regard to nursing policies and procedures" explaining "policy and procedure is only a

A-1917-23

guide for the nursing staff to provide and develop good quality of care to give to residents." She characterized facility procedures as "part of the standard of care" and acknowledged the facility's staff receive these procedures, which in part require "the resident's individual needs and preferences shall be accommodated to the extent possible." The internal procedures supplement "the federal regulations and the requirements to maintain safety of the residents," and the NHA.

Plaintiffs presented expert testimony from Nurse Tadrick and Dr. Hood. Nurse Tadrick testified as an expert in "the standards that apply to nurses who work in nursing homes." She explained she did not "blam[e] an individual person" for decedent's choking, and "there was nothing that came out that pointed to a specific person who obviously deviated from [the] standard of care that [she] could pick up from records." Instead, she identified a "systemic" problem with decedent's care and opined "collectively the nursing staff, as a whole, failed to meet certain standards."

Nurse Tadrick testified she reviews cases as an expert for "merit," and, without identifying any specific failures by facility nurses in this matter, explained "there are applicable standards of care for an individual like [decedent], with dysphagia and . . . all his particular issues and problems,

13

and . . . nursing is required to plan and implement specific interventions to keep him safe." She explained her affidavit of merit was based on her review of decedent's hospital records and discovery, and included her opinion to "a reasonable degree of nursing probability . . . there were deviations from [the] standard of care," therefore "caus[ing] harm to [decedent]."

Nurse Tadrick noted decedent's prior hospitalization came after he was "found at home unfortunately very ill with a urinary tract infection and he had unfortunately been seated on the toilet for a long time, so he developed quite extensive wounds." Additionally, she described decedent as having preexisting "metabolic encephalopathy," "a history of lymphedema," "a history of prostate cancer, [and] hypertension." She explained, at that earlier time, decedent "went into a hypoxic respiratory failure," rendering him "unable to protect his airway," so he was intubated at the hospital. After his intubation, decedent was diagnosed with oropharyngeal dysphagia, placing him at heightened risk of aspiration or choking. Nurse Tadrick described decedent as "severely impaired and he required extensive wound care, . . . so he was sent to [the facility] for subacute rehab[ilitative] therapies and further nursing care medical management."

Explaining "the interplay . . . between the federal regulations governing nursing homes and the standard of care in nursing homes," Nurse Tadrick

14

described the federal regulations as setting nursing home "guidelines" and the "minimum standard of care" for "everything from . . . quality of life, . . . treatments and medical nursing care" to "upholding a person's rights to . . . the highest practicable care, safety, things like that." Nurse Tadrick testified nursing homes utilize those guidelines "in developing . . . their policies and it does set a minimum standard of care."

Nurse Tadrick identified certain applicable federal regulations, and "in particular, the [NHA]," "require[] the nursing homes to ensure that residents have a safe and decent living condition and that they have the supervision and care that is required to meet their needs." She highlighted and read the text of 42 C.F.R. §§ 483.24, 483.25(d), 483.35, 483.5, and N.J.S.A. 30:13-5(j), as applicable to decedent's case.[7]

Nurse Tadrick explained "the care delivered to residents is on an interdisciplinary approach, [and] there are different specialties that all collaborate with each other to provide care." She testified that "a care plan is

---

[7] The federal regulations require long term care facilities to provide "quality of life," 42 C.F.R. § 483.24; "quality of care" in accident prevention, 42 C.F.R. § 483.25(d); and "sufficient nursing staff with appropriate competencies and skills . . . to provide nursing and related services," 42 C.F.R. § 483.35. N.J.S.A. 30:13-5(j) codifies a nursing home resident's right to "a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident."

required to be individualized" and "meet the specific needs of that person," and described it as "fluid," meaning "updated periodically, whether there's progress or there's issues."

Regarding the facility's care plan for decedent, Nurse Tadrick highlighted the requirements that staff "encourage resident to take small sips and bites" and "alternate liquids and solids" because decedent "had poor self-monitoring and he was impulsive, meaning that he had poor self-monitoring skills to not take large amounts of his food in his mouth at one time." The nurse interpreted these interventions as requiring staff's physical presence to continuously cue decedent in accordance with the interventions identified in his care plan and "monitor for signs and symptoms of aspiration." She noted the plan directed staff to "hold food/liquid" if decedent began coughing, as "coughing means that something had gone down the wrong pipe, . . . so you need to take the food and liquid away from him and address the coughing issue."

According to Nurse Tadrick, decedent's speech therapist reported a prior coughing incident, which Nurse Tadrick considered significant in showing defendant remained "at a very heightened risk for possible aspiration or choking." She opined someone's presence after decedent began choking instead of while he ate would "not [be] complying with th[e] care plan." Monitoring

A-1917-23

decedent in compliance with his care plan would have been a "benefit" as "cu[e]ing him and reminding him about taking small bites and sips and alternat[ing with] liquids and fluids" "immensely decreases his risk of aspiration or choking." She noted a staff member in the room could also intercept and address the choking or coughing situation "much quicker" and "right at the start," using the "suction machine" if necessary, "not a half a minute or a minute later."

Nurse Tadrick opined decedent's "right to a safe and decent living environment was violated" because he "required supervision [and] monitoring while he was consuming his meals, and that would create a safe environment for him, for someone to be there in the event something would happen and also to prevent him from choking or having aspiration." She added this incident "violated his right to individuality and dignity" as "the nursing staff was required to meet his needs and to uphold his rights and by failing to do so, . . . they did not uphold his rights." She indicated the nursing staff "failed to follow the individualized care plan on [January 26] in regard[] to providing the level of supervision and monitoring that [decedent] required to safely consume his meal" breaching the standard of care.

Nurse Tadrick repeatedly clarified she offered no opinion as to causation.

She conceded decedent could have choked if someone had been with him. Specifically, she replied "yes," when asked, "And can we agree, ma'am, that regardless of his level of supervision, . . . that whether someone was at the bathroom looking at him or standing at the door looking at him, or sitting down next to him, he was at risk for coughing on his food?" She offered no criticism of the staff's rapid response or interventions employed.

Dr. Hood then testified regarding the mechanics of the incident and its aftermath. The doctor confirmed viewing the video laryngoscopy that showed decedent's "vocal cords were obstructed by thick mucus and fragments of egg." He considered decedent's "inability to get his breath and . . . coughing," "very characteristic of somebody who has got something stuck in a ball valve type of effect on top of their vocal cords." The "ball valve effect," according to the doctor, describes when the item blocking the airway "pop[s] . . . out" allowing "a little bit of air back in, but not much," "prolong[ing] the choking as opposed to somebody who has completely occluded their upper airway." He explained, "They can breathe out, but they can't breathe back in and that's one of the reason[s] why, even though they're choking, if they've still got enough air left in their lungs and they haven't completely emptied them yet, they'll be able to even literally choke out a word or two."

18

Describing the interplay between choking and cardiac arrest, Dr. Hood testified "the choking on eggs is what caused him to have the cardiac arrest after a couple of minutes, and they actually got his heart going again, which, if it had been a cardiac event, would be highly unlikely to happen." Dr. Hood testified this "sustained him in a brain-dead state for almost two days afterwards," but still "it seem[ed] highly unlikely that it was a cardiac event that initiated this process," as opposed to the choking. Thus, the doctor opined "the cause of death [wa]s the choking on the eggs."

Dr. Hood also acknowledged decedent's preexisting health conditions including dysphagia, obesity, hypertension, prior "prostate cancer from which he developed lymphedema," a urinary tract infection at the time of his December 2018 hospital admission, bed sores, rhabdomyolysis, and pneumonia that developed at the hospital.

C. Directed Verdict

At the close of plaintiffs' case, the facility moved for a directed verdict and dismissal of all claims, based principally on the lack of proximate cause evidence.[8] Specifically, the facility claimed, as it had on its earlier motion for

_____

[8] Although brought by three separate motions addressing proximate cause, the NHA claims, and the punitive damages claim, the court addressed the motions

19                                                                    A-1917-23

summary judgment, neither of plaintiffs' medical witnesses opined as to proximate causation, and plaintiffs were required to offer expert testimony that staff presence in decedent's room "would have altered the outcome by either but[-]for or substantial fact[or]" causation.

Plaintiffs asserted Dr. Hood's testimony identifying decedent's choking on food as the cause of death "cover[ed] proximate cause." Plaintiffs also cited Nurse Tadrick's testimony indicating "someone need[ed] to be there cu[e]ing [decedent] to take small bites, . . . to alternate liquids with solids, . . . to monitor him for signs and symptoms of aspiration, . . . to intercept the choking process," and "if there's coughing, to remove the food and/or liquid." Plaintiffs' counsel argued the facility's failure to adequately monitor created "an interruption in that chain of events that then cause[d] the choking event." Counsel conceded there was no evidence in the record to show decedent had taken more than small bites and sips, but argued decedent's failure to do so could be inferred from his choking.

Regarding the punitive damages claim, the facility argued that too should be dismissed as plaintiffs failed to "demonstrate an intentional or willful

---

somewhat collectively, resolving them all by virtue of its proximate cause determination.

indifference, or . . . abuse." According to the facility, plaintiffs failed to identify any individual staff member arguably possessing the requisite intent to hold the facility liable for punitive damages. Plaintiffs countered that the trial evidence suggested "wanton omissions [by the facility], with a reckless indifference to [decedent] with the high foreseeability that he would suffer significant harm," and the NHA, specifically N.J.S.A. 30:13-8(a), includes a provision for punitive damages, arising from "willful or wanton" omissions.

Finally, the facility argued plaintiffs' claims under the NHA also failed for lack of proof of causation. The facility also noted no comprehensive care plan was required until fourteen days from the date of decedent's readmission. Plaintiffs argued they presented sufficient proof for a jury to conclude decedent did not reside in a "safe and decent living environment" and the facility did not provide decedent with the living experience sufficient to satisfy the NHA's requirements under N.J.S.A. 30:13-5(j) and the federal regulations, namely 42 C.F.R. §§ 483.24 and 483.35(a), citing the choking incident. Plaintiffs argued proof of violations of applicable regulations sufficed to sustain their NHA and residents' rights claims.

The court granted the facility's motion for a directed verdict and dismissed plaintiffs' complaint in its entirety. In its oral decision, the trial court cited the

applicable legal standards and found the absence of necessary causation testimony fatal to all claims. The trial court then thoroughly analyzed the record, emphasizing Nurse Tadrick offered no causation opinion, and Dr. Hood only described "the mechanics of choking" and opined the cause of death was decedent's choking on eggs, but did not opine any lapse by the facility or staff caused or exacerbated the severity of the choking.

The court noted the absence of testimony identifying or linking lapses in care protocol to decedent's injury. Specifically, the court stated:

> There's no criticism with the area of speech, dietary, physician, or hospital care. There's no criticism about documentation by the nursing staff. There's no opinion[] regarding a required one-on-one supervision on January 26[].
>
> There's no opinion that he was improperly admitted. There's no opinion about them failing to develop a care plan.
>
> There's no opinion given or criticism . . . given about the staff's response to prior choking incidents or about this particular choking incident.
>
> . . . I'm looking at some prior testimony where Nurse Tadrick was asked if she offered any opinion that [the facility's] staff . . . failed to timely respond to [decedent]'s cough or choking. She said she's not making any opinion on that.
>
> She's not making any opinion that they failed to use equipment properly. . . .

22

So, she doesn't provide any opinions on causation, so the jury can't look to her for the causation piece of this.

Regarding Dr. Hood's testimony, the court emphasized the doctor never opined "what [the facility] should have done or that had [the facility's staff] been in the room supervising, the choking would not have occurred," which would leave the jury to "speculate" as to the answers. The court further explained:

I didn't hear anything from Dr. Hood about the size of the egg that was in the throat. I don't think he provided any testimony about that.

There's no testimony in the record saying that [decedent] was taking too big of a bite at the time, or that he wasn't taking sips, or that he was doing anything different than he would have been doing had someone been in there cu[e]ing him to do that.

There's just no opinion in the record saying any of that, and a jury would have to be left to their own speculation on that point, which is a crucial point in the prima facie case for a plaintiff.

Thus, the court granted the facility's motion for a directed verdict "on the basis of the lack of proximate cause." Although clarifying Nurse Tadrick opined decedent was deprived of his right as a resident, pursuant to N.J.S.A. 30:13-5(j), to a "safe and decent living environment," the court confirmed it reached its decision because the nurse's testimony could not establish any alleged violation caused decedent's injury, nor could Dr. Hood's.

23

D. Motion for Reconsideration

After oral argument, the court denied plaintiffs' motion for reconsideration by February 21, 2023 order and accompanying written decision. Noting plaintiffs had renewed their prior arguments, specifically acknowledging plaintiffs' assertion there was "a distinction between a 'but-for' causation and a 'substantial factor' causation case," the court reiterated its reasons for granting the directed verdict and dismissing the complaint. The court specifically rejected plaintiffs' claim that Nurse Tadrick posited a sufficient opinion or theory of causation by merely testifying closer monitoring would have allowed for "cueing" decedent and possible earlier intervention after the onset of choking. The court reasoned "when a jury and this court must give all favorable inferences to her testimony, plaintiff cannot avoid [Nurse Tadrick's] repeated statements that she was not giving any opinion on causation," meaning the court "could not look to her as a ground[] to find causation in this case." (Emphasis omitted). The court also observed Dr. Hood "never provided any opinion on interception or how defendant's alleged deviation from the standard of care created [decedent's] choking." According to the trial court, "if allowed to continue, the jury would be left solely to speculate as to the link between the two, which is not permitted."

II.

On appeal, plaintiffs argue the court erred by: (1) finding plaintiffs failed to show proximate cause; (2) interpreting the NHA as requiring proof of proximate causation; (3) dismissing plaintiffs' punitive damages claim because it is "subsumed in its [NHA] violation of rights claim"; and (4) denying plaintiffs' request to use Homicillada's deposition testimony in lieu of live testimony.[9]

We review de novo a motion for a directed verdict by applying the same standard as the trial court. See Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). "Although we defer to the trial court's feel for the evidence, we owe no special deference to the trial court's interpretation of the law." Lechler v. 303 Sunset Ave. Condo. Ass'n, 452 N.J. Super. 574, 582 (App. Div. 2017) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Pursuant to Rule 4:37-2(b), the applicable standard for assessing a motion for a directed verdict "is whether the evidence, together with legitimate inferences that can be drawn from it, could sustain a judgment in favor of the

---

[9] Again, we do not reach the fourth claim in light of our dispositive causation determination.

party opposing the motion." Furey v. Cnty. of Ocean, 273 N.J. Super. 300, 309 (App. Div. 1994); see also R. 4:37-2(b). "This includes accepting as true all evidence supporting the party opposing the motion and according that party the benefit of all favorable inferences, and if reasonable minds could differ, the motion must be denied." Ibid. (citing Dolson v. Anastasia, 55 N.J. 2, 5 (1969)).

If "no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action," the trial court should grant defendant's motion. Smith, 225 N.J. at 397 (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)). However, "a judge is not to consider 'the worth, nature or extent (beyond a scintilla) of the evidence,' but only review 'its existence, viewed most favorably to the party opposing the motion.'" Lechler, 452 N.J. Super. at 582 (quoting Dolson, 55 N.J. at 5-6).

## A.

We first consider plaintiffs' argument the court erroneously granted a directed verdict for the facility and improperly dismissed its general and gross negligence claims for lack of sufficient proof of causation. Plaintiffs argue they "produced evidence that it was more likely than not that had a member of the nursing staff been in the room with [decedent], monitoring and supervising him,

this tragedy would not have occurred." They further contend the facility staff's failure to supervise or monitor decedent rendered it impossible for plaintiffs to gather proof showing "as a certainty that if someone was in the room, [decedent] would not have choked." Plaintiffs also claim the court improperly applied a "but[-]for" causation standard because they "tried the case on an 'increased risk of harm/substantial factor' causation basis."

According to plaintiffs, the facility's breach of applicable standards of care "gives rise to a reasonable inference that the breach of duty was a proximate cause of the harm," and the court erred in removing the case from the jury. They further contend no proof of medical causation or expert testimony was needed, and causation here "is a matter of logic and common sense," and does not involve complex medical issues. They argue they needed only show the facility's acts or omissions heightened the risk and were a substantial factor in bringing about decedent's injury, which they claim they presented in the form of Nurse Tadrick's testimony that a staff person's presence in the room might have been able to "cue" decedent or "intercept" the choking sooner. They claim Dr. Hood sufficiently opined the cause of death was choking on eggs establishing causation for the jury's consideration.

A-1917-23

Fundamentally, a plaintiff must demonstrate negligence by establishing: "(1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (quoting Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013)). "A 'plaintiff bears the burden of establishing those elements by some competent proof.'" Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Davis, 219 N.J. at 406) (excess internal quotation marks omitted).

Actual causation, often referred to as "but-for" causation, directs "an act or omission . . . not [be] regarded as a cause-in-fact of an event if the event would have occurred without such act or omission." Thorn v. Travel Care, Inc., 296 N.J. Super. 341, 346 (App. Div. 1997) (citing Kulas v. Pub. Serv. Elec. & Gas Co., 41 N.J. 311, 317 (1964)). Plainly, "the law requires proof that the result complained of probably would not have occurred 'but for' the negligent conduct of the defendant." Evers v. Dollinger, 95 N.J. 399, 415 (1984).

"Proximate cause consists of 'any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" Townsend, 221 N.J. at 51 (quoting Conklin v. Hannoch Weisman, 145 N.J. 395, 418 (1996)). In other words, "proximate cause 'is that combination of logic,

common sense, justice, policy and precedent that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery.'" Gilbert v. Stewart, 247 N.J. 421, 443 (2021) (quoting Williamson v. Waldman, 150 N.J. 232, 246 (1997)) (excess internal quotation marks omitted); see also Scafidi v. Seiler, 119 N.J. 93, 101 (1990) (quoting Caputzal v. The Lindsay Co., 48 N.J. 69, 77-78 (1966)).

Ordinarily, "proximate cause is a factual issue . . . resolved by the jury." Scafidi, 119 N.J. at 101. However, for a jury to find in favor of a plaintiff on the issue of negligence, "'there must be evidence or reasonable inferences therefrom showing a proximate causal relation between the facility's negligence, if found by the jury,' and the resulting injury." Reynolds v. Gonzalez, 172 N.J. 266, 284 (2002) (quoting Germann v. Matriss, 55 N.J. 193, 205 (1970)).

In medical malpractice actions, "the plaintiff has the burden of proving the relevant standard of care governing the defendant-doctor, a deviation from that standard, an injury proximately caused by the deviation, and damages suffered from the defendant-doctor's negligence." Komlodi v. Picciano, 217 N.J. 387, 409 (2014) (citing Verdicchio v. Ricca, 179 N.J. 1, 23 (2004); Evers, 95 N.J. at 406). To establish a prima facie case of nursing home negligence, a plaintiff must similarly prove not only that the defendant deviated from

recognized standards of medical-nursing care, but also that this deviation was a proximate cause of the complained-of injuries. Ptaszynski v. Atl. Health Sys., 440 N.J. Super. 24, 38 (App. Div. 2015).

The precise standard for proximate cause is dependent on the nature of the case. Ibid. When there is "a single alleged cause of harm, the jury is instructed on proximate cause in accordance with the standard 'but[-]for' instruction." Ibid. (citing Anderson v. Picciotti, 144 N.J. 195, 202 (1996)). However, in "cases in which a defendant's negligence combines with a preexistent condition to cause harm," the question becomes whether the "deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm." Verdicchio, 179 N.J. at 24 (first quoting Battenfeld v. Gregory, 247 N.J. Super. 538, 549 (App. Div. 1991); then quoting Gardner v. Pawliw, 150 N.J. 359, 376 (1997)); see also Scafidi, 119 N.J. at 102. "A preexistent condition or disease is one that has become sufficiently associated with a plaintiff prior to the defendant's negligent conduct so that it becomes a factor that affects the value of the plaintiff's interest destroyed by the defendant." Anderson, 144 N.J. at 211 (citing Joseph H. King, Jr., Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future

Consequences, 90 Yale L.J. 1353, 1357 (1981)). "A defendant whose acts aggravate a plaintiff's preexisting condition is liable only for the amount of harm actually caused by the [defendant's] negligence." Scafidi, 119 N.J. at 110 (quoting Ostrowski v. Azzara, 111 N.J. 429, 439 (1988)). Although the standard for substantial factor "is less stringent than the 'all or nothing but[-]for' standard, it does not alter a plaintiff's burden of proving the case by a fair preponderance of the evidence." Anderson, 144 N.J. at 210 (quoting Battenfeld, 247 N.J. Super. at 548).

Regarding the type of proof necessary to establish causation, our Supreme Court has directed "to establish a prima facie case of negligence in a medical[ ]malpractice action, a plaintiff must present expert testimony establishing [in part,] . . . that the deviation proximately caused the injury." Gardner, 150 N.J. at 375 (citing Germann, 55 N.J. at 205). "Absent competent expert proof, . . . the case is not sufficient for determination by the jury." Rosenberg v. Tavorath, 352 N.J. Super. 385, 399 (App. Div. 2002); see also Cowley v. Virtua Health Sys., 242 N.J. 1, 20 (2020) ("In the hierarchal setting of a multi-disciplinary medical team providing care to a hospitalized patient, . . . to assess a deviation in the standard of care in such a setting, one must know the procedures, protocols, and scope of duties of the licensed

31

professional nurses in such circumstances. An expert is required for that explanation. Such information is outside of the realm of common knowledge." (Omission in original)). However, expert testimony is not required in rarer, "common knowledge" cases in which "the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." Rosenberg v. Cahill, 99 N.J. 318, 325 (1985).

Even in non-medical malpractice cases, courts evaluate whether an expert is required by determining "whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable." Scully v. Fitzgerald, 179 N.J. 114, 127 (2004) (quoting Butler v. Acme Mkt., Inc., 89 N.J. 270, 283 (1982)). When proper evaluation requires "a complex assessment of a myriad of factors," the analysis likely falls "beyond the ken of the average juror." Giantonnio v. Taccard, 291 N.J. Super. 31, 44 (App. Div. 1996); see also Davis, 219 N.J. at 407.

Applying these standards, we are persuaded, as was the trial court, plaintiffs' negligence claims required but lacked sufficient evidence establishing causation. Here, plaintiffs failed to provide expert testimony regarding the

causal link between decedent's injury and any arguable lapse in care, which we are convinced was needed.

The parties dispute the precise nature of the claim—malpractice or general negligence—and the applicable proximate cause standard. Given the complexity of the medical and causal considerations, including but not limited to: decedent's pre-existing medical condition, the interrelationship between decedent's dysphasia and the choking incident and subsequent cardiac arrest, the mechanics of decedent's choking that morning, the interpretation of images of decedent's airway and the significance, if any, of the location and amount of egg "fragments" shown, the nature and extent of medical intervention provided, and the impact, if any, of other possible interventions on the outcome, we likewise reject plaintiffs' contention that expert medical testimony was not required to explain and potentially establish a causal connection between the facility's conduct and decedent's injury. Without expert assistance, under any causation standard, a jury would have been powerless to interpret the evidence or properly assess the vital causal link without resorting to impermissible lay speculation.

Whether framed as a medical malpractice action, professional negligence action, or an ordinary negligence claim, the questions of whether or what conduct or omission by the facility or its staff caused or heightened the risk to

decedent and contributed as a substantial factor to his injury was beyond the ken of the average juror. The jury would have been without "sufficient knowledge or experience" in this area, Posta v. Chung-Loy, 306 N.J. Super. 182, 204 (App. Div. 1997), and could not have assessed issues such as the degree of likelihood of a successful rescue by the facility's staff, the objective probability of decedent's survival with a nurse present at the onset of his choking, or even the degree to which a nurse's presence might have prevented choking altogether in these circumstances. As such, we conclude the trial court reasonably entered a directed verdict in the facility's favor as expert testimony was required, and none was provided.

Further, assuming without deciding the appropriate proximate causation test was whether the staff's monitoring or lack thereof increased the risk of harm and was a substantial factor in decedent's death, plaintiffs' proof was insufficient. To proceed to a jury, the evidence at its minimum must have been sufficient for a jury to find the absence of a staff member in the room heightened the risk of harm and some absence of earlier precaution or intervention was a substantial factor altering the course of unfortunate events. Here, that critical proof was missing.

Although Nurse Tadrick offered her expert opinion regarding the standard of care and a generalized breach of necessary monitoring, she admitted she did not offer an opinion as to causation; nor could she. See State v. One Marlin Rifle, 319 N.J. Super. 359, 368 (App. Div. 1999) (nurses' opinions may not anchor medical causation determinations). She opined regarding the facility's duties and any breach. Although she testified generally a nurse's presence in the room at the time of the choking's onset would have afforded additional time to intervene, her testimony stopped short of tying that broad observation to decedent's incident and was devoid of the requisite specificity concerning how or in what manner interventions would have been faster or more effective minutes earlier.

We also conclude Dr. Hood's testimony was insufficient to fill the causation void. As the trial court observed, Dr. Hood confined his testimony to the mechanics of decedent's death, specifically his choking on eggs, compromising his airway, likely bringing about his cardiac arrest. The doctor never opined the failure of staff to be present in the room prior to or at the moment decedent choked, the method by which decedent received or ingested his food, the precautions taken or not taken by staff, or deficiencies in decedent's

35

care plan or the response efforts caused the injury or was a substantial factor in bringing it about.[10]

We reject plaintiffs' claim "defendant . . . had the burden to show that the harm that occurred would have occurred regardless of the breach." Plaintiffs rely on factually dissimilar cases in which negligence clearly caused injury, but where only the precise defendant or action is unknown, to support its burden shifting claim. See Lanzet v. Greenberg, 126 N.J. 168, 170-72, 189 (1991) (holding "the superior knowledge of the physician require[d] that he or she distinguish the preexisting condition from the eventual harm caused" because "there was clear evidence of neglect by the operating-room physicians" after a cataract surgery patient lapsed into a coma during surgery after the procedure continued despite a dangerous decline in the patient's pulse). This is not such a case.

Here, the burden was plaintiffs' to establish each element of their claims including causation. See Gardner, 150 N.J. at 375. Plaintiffs never offered evidence or expert opinion to support the claim the harm would not have occurred, or the risk would have been substantially lessened, had staff been

---

[10] We note the care plan did not explicitly require staff's continuous presence in decedents room while he was eating.

A-1917-23

present. Any speculation staff might have possibly prevented the choking or mitigated its impact would be insufficient, improper, and beyond the record plaintiffs created.

Accordingly, we are satisfied plaintiffs did not sufficiently tether decedent's death, however tragic, to any arguable breach by the facility or its staff, and a directed verdict was appropriate as to the negligence claims.

B.

We next address plaintiffs' argument the trial court compounded its error by erroneously grafting a proximate cause requirement into their NHA claims. We are not persuaded.

The NHA "was enacted in 1976 to declare 'a bill of rights' for nursing home residents and define the 'responsibilities' of nursing homes." Ptaszynski, 440 N.J. Super. at 32 (quoting L. 1976, c. 120 § 1). A nursing home resident's rights under the NHA are defined in N.J.S.A. 30:13-5(a) through (n). Relevant to this action, N.J.S.A. 30:13-5(j) vests in nursing home patients

> the right to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident, including the right to expect and receive appropriate assessment, management and treatment of pain as an integral component of that person's care consistent with sound nursing and medical practices.

37

A nursing home's "responsibilities" are enumerated in a separate section of the NHA, N.J.S.A. 30:13-3(a) to (j). These obligations include the requirement that all nursing homes "ensur[e] compliance with all applicable State and federal statutes and rules and regulations." N.J.S.A. 30:13-3(h).

The NHA provides "any person or resident <u>whose rights as defined herein are violated</u> shall have a cause of action against any person committing such violation." N.J.S.A. 30:13-8(a) (emphasis added). However, as this court previously determined in <u>Ptaszynski</u>, the NHA does not similarly "authorize a person to bring an action to enforce the nursing home's 'responsibilities' as defined in the law." 440 N.J. Super. at 33-34 (finding the plaintiff could not "assert a cause of action for the alleged failure by defendant to fulfill its responsibility under N.J.S.A. 30:13-3(h) to comply with all applicable state and federal statutes, rules and regulations").

Here, plaintiffs alleged actionable violations of resident's rights pursuant to the NHA, specifically N.J.S.A. 30:13-5. However, citing no case law, plaintiffs assert a residents' rights claim is established for a jury's consideration on some proof of the violation alone, regardless of accompanying evidence that injury or harm was caused by the alleged breach. They again assert, as they did before the trial court, no proof of causation is necessary for an NHA claim to

reach a jury.

We look to a statute's plain language to ascertain legislative intent and construe the provision's verbiage "in accordance with its ordinary and common-sense meaning." Smith, 225 N.J. at 389-90 (quoting Saccone v. Bd. of Trs. of the Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014)). Here, N.J.S.A. 30:13-8(a)'s plain language confers the right to bring a "cause of action against any person committing" a violation of the NHA. (Emphasis added). Further, it permits a plaintiff "to recover actual and punitive damages." N.J.S.A. 30:13-8(a). Thus, the statute on its face, confers authority to maintain a cause of action against a nursing home to recover actual damages and punitive damages if the violation was sufficiently willful.

Although the statute does not contain causation language, it strains logic to conclude actual or punitive damages would be recoverable without some nexus to harm or injury, as by their very definition, damages serve that precise purpose. Indeed, damages are defined as "compensation for loss or injury." Black's Law Dictionary 488 (12th ed. 2024). Actual damages, or compensatory damages, aim to "compensate for a proven injury or loss." Id. at 488-89; see also Nappe v. Anschelewitz, Bar, Ansell & Bonello, 97 N.J. 37, 41 n.1 (1984) ("The terms 'actual' and 'compensatory' damages . . . refer to a monetary amount

39

awarded in court to compensate . . . plaintiff for an actual loss or injury suffered as a result of defendant's actions.").  By necessity, any damage award flows from a determination that the "losses suffered or to be suffered a[re] the result of the injur[y]," Glowacki v. Underwood Mem'l Hosp., 270 N.J. Super. 1, 15 (App. Div. 1994) (emphasis added) (citing Amaru v. Stratton, 209 N.J. Super. 1, 21 (App. Div. 1985)), as "plaintiff, generally, must apportion or relate damages to defendant's wrongful acts," O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am., 361 N.J. Super. 264, 274 (App. Div. 2003) (emphasis added); see also Black's Law Dictionary, 273 (defining "cause" as "something that produces an effect or result").

Plaintiffs' reliance on Model Jury Charges (Civil), 5.77, "Violations of Nursing Home Statutes or Regulations – Negligence and Violations of Nursing Home Residents' Rights Claims" (rev. Nov. 2023), is likewise unavailing. Preliminarily we note "trial judges are strongly encouraged to follow the [model jury] charges when they instruct a jury," but the instructions "are not binding statements of law." State v. O'Donnell, 255 N.J. 60, 79 (2023).  Notwithstanding their lack of binding authority, a review of the model instruction and sample verdict sheet does not, as plaintiffs suggest, persuade us causation is irrelevant to recover under the NHA.

The model instruction initially suggests the court orient the jury to the nature of the claim, stating, "In this case, aside from asserting that the defendants were negligent, the plaintiff claims that the defendants violated the rights of the plaintiff, as a nursing home resident, under the rights enumerated in the [NHA]." The model charge then directs the trial court to enumerate the resident's rights allegedly violated, suggesting a further instruction:

> If you find that the defendants violated any of these rights, you have found a violation of the [NHA], and a violation of the plaintiff's nursing home residents' rights. Thus, if you conclude that defendants violated plaintiff's nursing home residents' rights, you must find for plaintiff on this issue.
>
> [Model Jury Charges (Civil), 7.77, at 7.]

However, the same instruction then alerts the jury "not to duplicate damages" for negligence and violations of resident's rights. Ibid. To avoid duplicative damages, the proposed charge instructs:

> If you find that plaintiff has sustained separate and independent injuries, losses, and/or harms for the negligence and nursing home residents' rights, you may award separate damage awards. However, if you find that plaintiff did not sustain separate injuries or damages, then you may compensate plaintiff once and only once.
> [Id. at 7-8 (emphasis added).]

Thus, the damage charge requires the jury first find whether, in this case,

41

plaintiffs on decedent's behalf "sustained . . . injuries, losses, and/or harms," as a result of the negligence and rights violations.  Ibid.

Similarly, the sample verdict sheet specifically requires the jury to assess the damage award for any violation, inquiring, "What amount of money would fairly compensate for plaintiff's damages resulting from the violation(s) of plaintiff's nursing home residents' rights?"  Id. at 9 (emphasis added).  The question probes compensatory damages caused by the violation.

This interpretation comports with our determination in Ptaszynski, concluding the "plaintiff's evidence did not . . . distinguish between the injuries and harm caused by defendant's alleged violations of the NHA and its alleged negligence."  440 N.J. Super. at 39 (emphasis added).  The prohibition on duplicative recovery requires assessment of the respective harms "caused" by any negligence or violation of rights.

As such, we discern no merit to plaintiffs' contention they did not have to show some causal relationship between the alleged NHA violations and the "actual damages" sought.  Critically here, neither plaintiffs' complaint nor the evidence at trial claimed separate injury or damages distinct from those alleged in their negligence claims.  Thus, plaintiffs' NHA claims were inextricably tied to negligence claims and dependent on plaintiffs' establishing the facility caused

42                                                     A-1917-23

decedent's injury. Without such proof, the NHA claims could not stand alone before a jury on the record plaintiffs created.

C.

Finally, we address and reject plaintiffs' argument that the punitive damages claim should have survived a directed verdict. Because the trial court properly entered a directed verdict in favor of the facility on plaintiffs' negligence and NHA claims, it correctly dismissed the punitive damages claim. New Jersey's Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, governs claims for punitive damages in civil actions. "The PDA codified common law principles underlying punitive damages, under which punitive damages were limited 'to only exceptional cases . . . as a punishment of the defendant and as a deterrent to others from following his example.'" Rivera v. Valley Hosp., Inc., 252 N.J. 1, 18 (2022) (omission in original) (quoting Pavolva v. Mint Mgmt. Corp., 375 N.J. Super. 397, 404 (App. Div. 2005)) (internal quotation marks omitted).

When, as here, a trial court bifurcates a trial on a plaintiff's damages claims, "punitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial," and "an award of nominal damages cannot support an award of punitive damages." N.J.S.A. 2A:15-5.13(c).

Because a directed verdict resulted in dismissal of plaintiffs' claims to compensatory damages, the claim for punitive damages could not survive.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division